674 So.2d 1169 (1996)
Donita DENTON
v.
CRITIKON, INC., Johnson and Johnson, Inc.,[1] and Medical Center of Baton Rouge.[2]
No. 95 CA 1602.
Court of Appeal of Louisiana, First Circuit.
May 10, 1996.
Rehearing Denied June 25, 1996.
*1171 Scott T. Gegenheimer, Baton Rouge, and Edward J. Walters, Jr., Baton Rouge, for Plaintiff-Appellant.
Daniel A. Reed, Baton Rouge, for Defendant-Appellee.
Before SHORTESS, PARRO and KUHN, JJ.
SHORTESS, Judge.
Donita Denton (plaintiff) suffered from a skin condition called pyoderma gangrenosum. She was admitted to Medical Center of Baton Rouge, Inc. (defendant), for treatment of this condition by intravenous (IV) administration of cortico-steroids. An IV catheter with a heparin lock was inserted into her left antecubital fossa (the vein in the inner surface of the elbow) on February 15, 1989. The following day Susan A. Tarleton, a registered nurse, attempted to remove the existing IV line and start a new one. When she removed the tape covering the IV site, Tarleton found the hub of the heparin lock had separated from the IV catheter. The catheter, a piece of Teflon approximately 1¼ inches long, was never found.
What became of the catheter and how the catheter separated is a mystery, the solution to which lies outside this appellate record. The catheter was not found either outside or inside plaintiff's body. Plaintiff's treating dermatologist, Dr. Charles V. Perniciaro, testified he personally inspected the area immediately adjacent to plaintiff but did not find the catheter in the bedding. Plaintiff's mother, Ann Virgillio, stated she emptied the trash can in plaintiff's room and searched for the catheter but found nothing.
Efforts to locate the catheter inside plaintiff's body were also fruitless. Perniciaro consulted with a cardio-vascular surgeon, Dr. Nelson Ancalmo, on the night the catheter was lost. They immediately performed a vein cut-down and balloon catheterization in an attempt to locate it, without success. X-rays of plaintiff's body were ineffective because the catheter was nonradiopaque. An echocardiogram to determine whether the catheter was lodged in plaintiff's heart was inconclusive.
Plaintiff sued defendant for the pain and anxiety she has suffered and the anxiety she continues to suffer as a result of the missing catheter.[3] After a jury found defendant was not negligent, the trial court rendered judgment dismissing plaintiff's suit. From that judgment plaintiff appeals.
Plaintiff's appeal is based on several alleged evidentiary errors and the failure of the trial court to give a requested jury instruction. If a jury's verdict is tainted by *1172 prejudicial jury instructions or incorrect rulings on admissibility of evidence in a tort case, the jury's liability decision is entitled to no deference, and the appellate court must conduct a de novo review. Andrus v. State Farm Mutual Auto. Ins. Co., 95-0801, p. 10 (La. 3/22/96), 670 So.2d 1206. We shall first address the evidentiary issues.

LEARNED TREATISES
Plaintiff contends the trial court erred in refusing to admit learned treatises into evidence. Plaintiff's expert pathologist, Dr. James A. Freeman, testified regarding articles from medical treatises on the effect of catheter fragments which have entered patients' bloodstreams. The trial court permitted Freeman to testify as to the substance of the articles but refused to permit plaintiff to introduce them into evidence, stating: "I think the point is adequately covered by the testimony." Plaintiff then proffered the articles.
Louisiana Code of Evidence article 803 provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or, in a civil case, relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of ... medicine ... established as a reliable authority by the testimony or admission of the witness.... If admitted, such a statement may be read into evidence and received as an exhibit but may not be taken into the jury room.
Freeman testified the treatises plaintiff proffered were recognized as learned medical literature,[4] and they were relied upon by Freeman in his direct examination. They are not considered hearsay under the Code of Evidence. However, the trial court did not exclude these articles as hearsay; it excluded them as repetitive of Freeman's testimony.
The trial court has authority under Code of Evidence article 611(A) to exercise reasonable control over the presentation of evidence so as to make the presentation effective for the ascertainment of the truth and avoid needless consumption of time. The relevant portions of the articles plaintiff sought to introduce had been thoroughly discussed by Freeman during his testimony. We find the trial court did not abuse its discretion in excluding these articles.

EVIDENCE OF VICTIM FAULT
Plaintiff contends the trial court erred in admitting evidence and allowing argument regarding victim fault. Defendant filed a general denial answer. Plaintiff objected to each attempt by defendant to expand the pleadings, and the trial court excluded the great majority of the evidence to which plaintiff objected.[5]
Defendant attempted to introduce the testimony of two physicians who treated plaintiff for factitious disorder, a psychiatric condition in which a patient artificially produces symptoms, but their testimony was excluded, as were medical records indicating possible factitious disorder.[6] The only mention of factitious disorder in front of the jury was as follows:
Q. Now when you initially saw Dr. Media in April of 1992, you gave himor he had a history of factitial disorder in connection with your case; isn't that right?
[Plaintiff objects to relevancy and lack of foundation]

*1173 The Court: Restate the question.
[Defense counsel]: The history that you gave to Dr. Media the first day you saw him on Aprilin April of 1992 was of factitial disorder.
[Plaintiff objects again; court asks defense counsel to restate question]
Q. When you first saw Dr. Media onin April of 1992, the history that he had with regard to your case was of suspicion or possible factitial disorder, right?
A. I discussed with Dr. Media the problems that I had and there were many problems at that time and factitious disorder did come up in our conversation.
Q. All right. What is your understanding of what factitious disorder is?
[Plaintiff objects; objection is sustained]
Q. Dr. Perniciaro had also discussed factitial disorder with you in 1987, didn't he?
A. Dr. Perniciaro did not discuss factitious disorder with me.
Q. Let me show you some other notes f[ro]m Ochsner and see if this helps you recall.
A. Well, factitious disorder was never
[Court admonishes witness to answer question asked]
Q. Do you remember those conversations with Dr. Perniciaro?
. . . .
A. Yes, I remember the conversations that we had this time. Yes.
By Mr. Reed:
Q. And so you had discussed factitial or patient induced problems with Dr. Perniciaro, right?
A. He discussed patient, but never used the word "factitious[."]
Q. All right. He used the term "patient induced"?
A. No. He asked me point-blank, do you think this is something that you could have possibly done to the wound.
Plaintiff contends this testimony was intended to lead the jury to believe she had a psychiatric disorder which caused her to cut her own catheter, then to either replace it in her vein so it would separate while in her body or to dispose of the catheter and pretend it was lost in her body. While plaintiff's diagnosis of possible factitious disorder should not have been raised by defendant after the trial court excluded all evidence of victim fault, we find this brief mention of factitious disorder during the course of a four-day trial was harmless.

FAILURE TO GIVE RES IPSA CHARGE
Plaintiff contends the trial court erred in failing to charge the jury on the doctrine of res ipsa loquitur.
Res ipsa involves a plaintiff's use of circumstantial evidence to meet the burden of proof by a preponderance of the evidence. In order to use this doctrine, the plaintiff must establish a foundation of facts on which it may be applied. Cangelosi v. Our Lady of the Lake Reg'l Medical Ctr., 564 So.2d 654, 665-666 (La.1989) (on rehearing). It is specifically applicable in cases involving unusual occurrences during the time of medical supervision. Orgeron v. Lafourche Parish Hosp. Dist. No. 1, 625 So.2d 739, 740 (La. App. 1st Cir.1993).
The injury must be of the type which does not ordinarily occur without negligence. The plaintiff does not have to eliminate all other possible causes or inferences but must present evidence which indicates at least a probability the injury would not have occurred without negligence. In the light of ordinary experience, the event must give rise to an inference that someone must have been negligent. The plaintiff also must sufficiently exclude his own conduct or the conduct of others beside the defendant as a more probable cause. Cangelosi, 564 So.2d at 666.
Finally, the plaintiff must establish the defendant's negligence falls within the scope of his duty to the plaintiff. This is often, but not necessarily, proved by showing the defendant had exclusive control of the injury-causing instrumentality. Id.
Res ipsa is applied after all the evidence has been presented. The trial judge must initially determine whether the jury could reasonably infer from the circumstances *1174 that the plaintiff's injury was caused by the negligence of the defendant. If the judge determines reasonable minds could reach different conclusions on whether the defendant's negligence caused the plaintiff's injury, the judge must present the issue to the jury and instruct the jury on the doctrine of res ipsa loquitur.[7]Id. at 667; Smith v. Bundrick, 27,552, p. 6 (La.App. 2d Cir. 11/3/95), 663 So.2d 554, 558. The jury then decides whether to draw the inferences. Cangelosi, 564 So.2d at 666.
In this case, the parties stipulated an examination of the catheter hub by Dr. Thomas C. Shelton, an expert in metallurgical engineering, revealed the catheter was cut three-fourths of the way through from the outside by what he believed to be scissors. There was no direct evidence as to how, when, or by whom the catheter was cut. Dr. Charles W. Stratton, defendant's expert in pathology and microbiology, with a special interest in IV catheters, testified fragmentation of IV catheters is very rare. Plaintiff established that the alleged injury in this case, embolization of an IV catheter fragment caused by cutting the catheter with scissors, is a type of injury which normally does not occur in the absence of negligence. This injury falls within the scope of defendant's duty to plaintiff as a patient in its hospital. Reasonable minds could reach differing conclusions as to how the catheter was cut. Thus, the trial court erred in failing to instruct the jury on the doctrine of res ipsa loquitur.
Because of this error, we find the jury verdict was tainted because plaintiff was deprived of the inferences provided by the res ipsa doctrine. Therefore, we shall conduct a de novo review of the evidence on the issue of liability. Andrus v. State Farm, 95-0801, p. 10 (La. 3/22/96), 670 So.2d 1206.

DE NOVO REVIEW
Use of the doctrine of res ipsa loquitur in a negligence case does not relieve the plaintiff of the ultimate burden of proving all the elements necessary for recovery by a preponderance of the evidence. Cangelosi, 564 So.2d at 666. The circumstantial evidence in this case in support of plaintiff's claim the catheter was cut by a hospital employee is scant.
Plaintiff testified she had been hospitalized numerous times and was always catheterized. She stated she has been catheterized one hundred or more times since this incident. She described the general procedure nurses follow in inserting an IV and in caring for her dressings. She stated the nurses bring a "catheter dressing tray" into the room, which includes scissors. They put on surgical gloves because of her pyoderma. Sometimes they tear the tape before putting on gloves, but if they need more after they have donned gloves, they cut the tape with scissors they carry in their pockets.
She further stated during her hospital stay in February 1989, tape from the dressing over her abdominal pyoderma sometimes irritated her skin. If the tape was stuck too securely, the nurses cut the bandages off and removed the tape later, using a product which dissolved the adhesive.
Plaintiff had no clear recall of the insertion of the IV catheter involved in this incident. At trial, six years after the incident, she initially stated she did not recall whether the tape was torn or cut. She later admitted that in her deposition taken a year and a half after the incident she stated the nurse "must have torn it."
Both the nurse who inserted the catheter, Belinda H. Mounce, and the nurse who attempted to remove it, Susan Tarleton, testified they always tear the tape. Tarleton stated that she has never used scissors to either insert or remove an IV catheter and that scissors used to cut the dressing on an open wound would have to be obtained from central supply. She further stated that in 1989 nurses did not wear gloves to insert *1175 catheters, although they do now because of the risk of contracting AIDS.
We have a great deal of sympathy for plaintiff. The pyoderma from which she suffers has no known cause or cure, and she has developed many complications from treatment. She described her anxiety arising from the missing catheter fragment as "one more iron thrown in my fire that I didn't need...."
Our sympathy for plaintiff, however, cannot override our duty as a court to base our decision on the law and the evidence. In this case, the evidence simply does not support plaintiff's claim, even given the inferences from the application of res ipsa loquitur. Plaintiff has failed to prove more likely than not that one of defendant's employees cut the IV catheter inserted in her arm.
For these reasons, the judgment in favor of defendant, Medical Center of Baton Rouge, Inc., dismissing plaintiff's suit, is affirmed. Costs of this appeal are assessed to plaintiff.
AFFIRMED.
NOTES
[1] The correct name of this defendant is Johnson & Johnson.
[2] The correct name of this defendant is Medical Center of Baton Rouge, Inc.
[3] Plaintiff also sued Critikon, Inc., and Johnson & Johnson, the alleged manufacturers of the catheter. Summary judgment was granted dismissing those defendants prior to trial.
[4] The proffered literature included The Journal of the American Medical Association, the British Medical Journal, and The American Journal of Surgery.
[5] Plaintiff complains in brief of defendant's attempt to call nurses to testify that two years after this incident a PCA line in plaintiff's hospital room was inexplicably cut. This complaint has no merit on appeal because this evidence was excluded by the trial court.
[6] The terms "factitious" and "factitial" were used interchangeably by the parties.
[7] We note that in White v. McCool, 395 So.2d 774, 777 (La.1981), the supreme court stated if "the accident might have happened as the result of one of two causes, the reason for the [doctrine of res ipsa] fails and it can not be invoked." Cangelosi v. Our Lady of the Lake Regional Medical Center does not explicitly overrule this portion of White, but as this statement is inconsistent with Cangelosi, we must follow the more recent pronouncement.