676 So.2d 218 (1996)
Claudette LEFORT
v.
Robert L. VENABLE, Dupré Transport, Inc. and Commercial Union Insurance Company.
Wayne C. HEBERT and Charlinda Hebert
v.
DUPRÉ TRANSPORT, INC., Robert C. Venable and Commercial Union Insurance Co.
Nos. 95 CA 2345, 95 CA 2346.
Court of Appeal of Louisiana, First Circuit.
June 28, 1996.
*219 Joel Hanberry, Cut Off, for Plaintiff-Appellee Claudette Lefort.
Howard W. Martin, Lafayette, for Plaintiffs-Appellees Wayne Hebert and Charlinda Hebert.
Robert I. Baudouin, New Orleans, for Defendants-Appellants Commercial Union Ins. Co., Robert L. Venable, and Dupré Transport Co.
Denis J. Gaubert, III, Thibodaux, for Defendant-Appellee La. Farm Bureau Casualty Co.
Thomas G. Wilkinson, Gretna, for Defendants-Appellees Halliburton Co. and Employee's Trust.
Philip E. Henderson, Houma, for Defendants-Appellees William S. George, M.D. and La. Medical Mutual Ins. Co.
Before LOTTINGER, C.J., and LeBLANC, and FOGG, JJ.
FOGG, Judge.
Defendants/appellants, Robert L. Venable, Dupré Transport, Inc., and Commercial Union Insurance Company, appeal the judgment of the trial court finding that third party defendant, William S. George, M.D., did not commit medical malpractice when he operated on plaintiff, Claudette Lefort. We affirm.
Claudette Lefort injured her lower back in an automobile accident on August 9, 1989; that accident involved a tractor-trailer operated by Robert L. Venable, owned by Dupré Transport, and insured by Commercial Union Insurance Company. After nearly two years of treatment, Ms. Lefort's neurosurgeon, Dr. John D. Jackson, recommended lumbar surgery which was to take place on May 17, 1991. However, when she was admitted to the hospital for this surgery, a routine blood test revealed that her platelets were low and the surgery was canceled. Dr. Jackson referred Ms. Lefort to a hematologist, Dr. Robert Weilbaecher, who explained to Ms. Lefort that she might have idiopathic thrombocytopenia purpura (ITP), a condition in which the platelets are destroyed by the spleen. Dr. Weilbaecher explained that a treatment for ITP is the removal of the spleen; however, he recommended drug therapy before such surgery was undertaken to verify the diagnosis. At that time, Ms. Lefort told Dr. *220 Weilbaecher that if spleen surgery became necessary she wanted Dr. William S. George to perform the surgery. Ms. Lefort knew Dr. George because he had previously performed unrelated surgery on her. Dr. Weilbaecher along with Ms. Lefort's family physician, Dr. LeBlanc, monitored her platelet count over a several month period, during which time Dr. Weilbaecher administered the drug therapy.
Ms. Lefort saw Dr. George on August 5, 1991; she discussed her treatment with Dr. Weilbaecher and asked Dr. George if he would perform the splenectomy if it became necessary. Dr. George agreed to perform the surgery if it became necessary and advised her to continue her care under Drs. Weilbaecher and LeBlanc.
The continual monitoring of her platelet count revealed sporadic improvement. On September 12, 1991, Dr. Weilbaecher ordered a bone marrow aspiration. That test report provided the following final diagnosis: moderate megakaryocytic hyperplasia; mild myeloid and erythroid hyperplasia; marked increase in iron stores; and no evidence of malignancy. On her discharge summary, Dr. Weilbaecher wrote "Final Diagnosis: 1. Idiopathic Thrombocytopenic Purpura 2. Osteo-arthritis."
Ms. Lefort saw Dr. Weilbaecher one week later. She testified that at that time he recommended surgery. She told him she wanted Dr. George to do the surgery and he gave her a sealed envelope with Dr. George's name on it. When Ms. Lefort saw Dr. George on October 2, 1991, she gave him the envelope and told him Dr. Weilbaecher recommended surgery. Dr. George scheduled the surgery.
Ms. Lefort was admitted to the hospital on October 7, 1991, and a splenectomy was performed the following day. Unfortunately, she experienced complications after the surgery. She began bleeding in her chest and further surgery was required to stop the bleeding during which she went into respiratory arrest. When she was released from the hospital, she required rehabilitation. A few months later, she underwent repair of a diaphragmatic hernia. Approximately two years later, she underwent a foraminotomy for the pain in her lower back which was caused by the automobile accident.
Ms. Lefort filed suit against Robert L. Venable, Dupré Transport, and Commercial Union Insurance Company. The defendants then filed a third-party action against Dr. George and Louisiana Medical Mutual Insurance Company, Inc., claiming that the portion of the damages attributable to complications from the splenectomy was due to the medical malpractice of Dr. George. Subsequently, Ms. Lefort amended her suit to name Dr. George and his insurer as defendants. The trial court ruled in favor of Ms. Lefort against Dupré Transport and Commercial Union Insurance Company and dismissed all claims and demands against Dr. George and Louisiana Medical Mutual Insurance Company. Dupré Transport and Commercial Union Insurance Company appeal, contending the trial court erred in finding no medical malpractice.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State Through DHHR, 523 So.2d 815 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). Resolution of each of these involves a determination of fact which should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with benefit of hindsight. Opinions from medical experts are necessary to determine both the applicable standard of care, and whether that standard was breached. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Stein v. Insurance *221 Corp. of America, 566 So.2d 1114 (La.App. 2 Cir.), writ denied, 569 So.2d 984 (La.1990); Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2 Cir.), writs denied, 567 So.2d 1123, 1124 (La.1990). Where there are contradictory expert opinions concerning compliance with the applicable standard of care, the reviewing court will give great deference to the conclusions of the trier of facts. Bolton v. Louisiana State University Medical Center, 601 So.2d 677 (La.App. 2 Cir.1992).
The appellants assert the trial court erred in failing to find that Dr. George deviated from the standard of care of general surgeons when he performed the splenectomy upon Ms. Lefort without consulting with the treating hematologist and/or receiving clearance from him for the surgery. We disagree. The trial court found that there was adequate communication between the hematologist and the general surgeon prior to the performance of the splenectomy for the following reasons, which are substantiated by the record. Dr. Weilbaecher's platelet chart, the surgical pathology report dated September 13, 1991, and Dr. Weilbaecher's undated, handwritten note to Dr. Jackson were a portion of Dr. George's medical records prior to the splenectomy. Dr. LeBlanc spoke with Dr. Weilbaecher after each platelet count. Dr. LeBlanc communicated via telephone with Dr. Weilbaecher after the September 26, 1991 platelet count. After September 26, 1991, Dr. Wilbaecher informed Dr. LeBlanc that Ms. Lefort met the criteria for a splenectomy, and she required a splenectomy prior to her lumbar surgery. Dr. LeBlanc informed Dr. George that Dr. Weilbaecher was of the opinion that Ms. Lefort met the criteria for a splenectomy, and she required a splenectomy prior to her lumbar surgery.
Additionally, it is clear from the record that Dr. George did have the records from the September 12, 1991 bone marrow test prior to performing the splenectomy and some form of communication from Dr. Weilbaecher. Dr. George's handwritten chart from October 2, 1991, states in pertinent part:
Dr. Weilbaecher feels that she has ITP and advises splenectomy. See report of platelet count and bone marrow. Discussed with Dr. LeBlanc. Admit for splenectomy Tuesday.
The hospital record dated October 7, 1991, states in part:
Seen by hematologist, who diagnosed Idiopathic thrombocytopenia purpura. Has been on Danocrine, but low platelet count persists. Bone marrow studies show megakaryocytosis.
Although Dr. George could not remember how he got the records discussed above, Ms. Lefort's testimony clearly establishes that he received them from her. Furthermore, Dr. LeBlanc testified that he spoke to Dr. Weilbaecher after September 25, and Dr. Weilbaecher told him that Ms. Lefort did require a splectomy. Dr. George and Dr. LeBlanc both testified that Dr. LeBlanc conveyed Dr. Weilbaecher's statement to Dr. George prior to the surgery.
It is further clear from the record that performing a splenectomy on Ms. Lefort was not a deviation from the standard of care. Dr. Weilbaecher testified during his deposition that the only way he would have agreed to her back surgery without taking out the spleen was if her platelet count remained normal for a five to six month period. Furthermore, he testified that, if she was to have back surgery in the next two or three months, he thought anybody would have told her she should have her spleen taken out first. He stated that when her platelet count fell to a low level on September 12, after it had improved, a correct course of action, even without having any other surgery, would have been to remove her spleen. He also stated, that she did meet the criteria to have her spleen removed irrespective of whether she was going to have back surgery. When asked if the decision to do the splenectomy on October 8, 1991 was proper, he answered, "Yes. That's right." Finally, he could not remember if he spoke to Dr. George about Ms. Lefort's condition, but he was certain that he spoke with Dr. Leblanc several times and told him that if the patient wanted to have back surgery to relieve her pain, she must first have her spleen removed because she had been diagnosed with ITP.
*222 Although there was some contradictory expert opinions concerning whether or not such communications met the applicable standard of care, the majority of the experts who testified stated that the information in Dr. George's file prior to the surgery and the communications with Dr. LeBlanc provided Dr. George with sufficient information to proceed with surgery. The trial court determined that those opinions were correct. We find no manifest error in the trial court's determination that the removal of Ms. Lefort's spleen did not constitute malpractice.
Appellants' urge further that the trial court erred in failing to find that Dr. George deviated from the standard of care in his choice of incisions. Specifically, appellants allege that Dr. George committed malpractice in that he used a thoraco-abdominal incision instead of an abdominal incision.
The trial judge heard the testimony of eight general surgeons, including Dr. George. Without exception, each testified as to the most commonly used incisions. The most common incision is a vertical, midline incision. The second most common incision is the subcostal incision. The thoraco-abdominal incision is the least common incision for an elective splenectomy. In fact, prior to this case, none of the surgeons had initially used the thoraco-abdominal incision for an elective splenectomy. However, several of the physicians stated that, in their experience with splenectomies, there were occasions where once the abdominal incision had been made and the surgery initiated, there was not adequate exposure to safely remove the spleen and the incision was converted by extending it into the chest in order to get better exposure. The end result of this conversion is the same as a thoraco-abdominal incision.
With the exception of one of the appellants' experts, all of the physicians testified that the decision of which incision to use is the surgeon's choice based on balancing the risks for his patient and that the choice of the thoraco-abdominal incision, in and of itself, was not a violation of the standard of care. The court questioned Dr. Corcoran, a member of the medical review panel in this case, regarding his opinion of the incision employed by Dr. George in this splenectomy and he responded that it was perfectly acceptable. The court also questioned Dr. Powell, another member of the medical review panel regarding his opinion on the choice of incisions. Dr. Powell stated that the type of incision used by Dr. George did not constitute malpractice; that the patient could have had a bleed in the abdomen just as easily as in her chest. He stated that it is easier to detect bleeding in the chest than in the abdomen. The other physician on the medical review panel, Dr. Bonneval, stated that although he was of the opinion that it was a poor choice of incisions, it did not constitute a breach of the standard of care.
Dr. George testified that when performing splenectomies he commonly used the vertical, midline incision and his second most common choice was the subcostal incision. However, in this case Dr. George and his partner, Dr. Hoagland, who assisted in the surgery, determined that because of Ms. Lefort's body build a thoraco-abdominal incision was more appropriate. Ms. Lefort is a hypersthenic person, that is, one who is short and squat, fairly muscular, and proportionately wider than tall, with big bones, wide hips, and a wide chest. Further, at the time of surgery she weighed approximately 230 pounds and was considered obese. Because of her build, the use of a midline incision would have resulted in a distance of nearly three feet between the spleen and the incision.
The appellants assert that all of the complications suffered by Ms. Lefort were caused by the use of the thoraco-abdominal incision. When questioned by the trial court, Dr. Powell testified that today the risk is virtually the same whether you enter the chest or abdominal cavity. Dr. Craighead testified that post-splenectomy problem bleeding is quite frequent irrespective of which approach is used and that there is a greater probability of a major hemorrhage with the abdominal incision because the surgeon cannot see the spleen as well with that incision. The record clearly indicates that there are also risks inherent in the midline and subcostal incisions. The trial court ruled that the preponderance of the evidence showed that the choice of the thoraco-abdominal *223 incision for use in an elective splenectomy was not a violation of the degree of care ordinarily practiced by a general surgeon within the field of general surgery. The court relied on the nearly unanimous testimony of the physicians which established that the degree of care was not violated; as well as the medical treatise David C. Sabiston, Jr., M.D. & Frank C. Spencer, M.D., Gibbon's Surgery of the Chest, 3rd Ed. which states that the thoraco-abdominal incision on the left side of the body is useful for the performance of an elective splenectomy. We do not find that this ruling was manifestly erroneous.
For the foregoing reasons, the judgment of the trial court is affirmed. Appellants are assessed all costs of this appeal.
AFFIRMED.