757 So.2d 666 (1999)
Kim BRADBURY and Richard Baumy Individually and as Representatives of Richard Jake Baumy
Intervenor: Louisiana Patients' Compensation Fund
v.
Clinton L. THOMAS, M.D.
No. 98 CA 1678.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
*668 T. Carey Wicker, III, Stephen D. London, New Orleans, for Plaintiffs-Appellants Kim Bradbury and Richard Baumy Individually and as Representatives of Richard Jake Baumy.
Bruce A. Cranner, Frederick T. Greschner, Jr., New Orleans, for Intervenor-Appellant Louisiana Patients' Compensation Fund.
James R. Strain, Jr., Slidell, for Defendant-Appellee Clinton L. Thomas, M.D.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
*669 PETTIGREW, J.
Following a jury trial in this medical malpractice action, a verdict was returned wherein it was determined that the defendant had breached the applicable standard of care in delivering plaintiffs baby. The jury assessed fault 51 percent to the defendant and 49 percent to "Any other person," and awarded $500,000 in damages to the plaintiffs in their capacity as representatives of their minor child. All parties subsequently filed motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, which were denied by the trial court. The parties now appeal. For the reasons that follow, we reverse in part, amend, and as amended, affirm.

FACTS
According to the record, this case involves a medical malpractice action instituted by plaintiffs, Kim Bradbury and Richard Baumy, individually and as representatives of their minor child, Richard Jake Baumy ("baby Richard"), against defendant, Dr. Clinton L. Thomas, the obstetrician who delivered baby Richard. Plaintiffs allege that Dr. Thomas breached the applicable standard of care with respect to the treatment rendered to baby Richard and Kim Bradbury. The record reveals that baby Richard was born on October 13, 1991, following a very difficult vaginal delivery in which forceps were used. The plaintiffs further allege that as a result of the trauma associated with birth, baby Richard sustained a left-sided epidural hematoma that necessitated a craniotomy and surgical evacuation, which were ultimately performed on October 24, 1991. Baby Richard also sustained a skull fracture and a cephalhematoma. Plaintiffs complain that as a result of these injuries, baby Richard has suffered a permanent disability from a neurological standpoint. The plaintiffs further assert that Kim Bradbury has suffered urinary incontinence and bladder dysfunction since the birth of baby Richard and complain that these conditions are a direct result of the trauma associated with the delivery.

PROCEDURAL HISTORY
Prior to the trial of this matter, Dr. Thomas filed a motion for summary judgment alleging that the plaintiffs had failed to meet their burden of proving that Dr. Thomas had breached the applicable standard of care, and in the alternative, that the plaintiffs had failed to prove that the use of the forceps by Dr. Thomas in the delivery of baby Richard was causally related to any injuries allegedly sustained. The trial court denied the motion after reviewing evidence submitted by both parties and hearing argument of counsel. The matter proceeded to a jury trial on September 29, 1997, and on October 8, 1997, the jury returned a verdict finding that Dr. Thomas had breached the applicable standard of care, resulting in damages to baby Richard. The jury apportioned fault 51 percent to Dr. Thomas and 49 percent to "Any other person," and awarded $500,000 .00 in damages to baby Richard. The jury also determined that Dr. Thomas' breach of the standard of care was not a proximate cause of the damages allegedly suffered by Kim Bradbury. The trial court signed a judgment in accordance with the jury's verdict on November 5, 1997.
After the judgment was signed by the trial court, the parties each filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Subsequently, on November 12, 1997, the Louisiana Patients' Compensation Fund ("PCF") filed a petition of intervention alleging that "it has an interest in the aforesaid judgment, in that pursuant to the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41 et seq., it is responsible for any sums awarded in excess of $100,000.00 and that it has the right to and wishes to contest and/or appeal the aforesaid judgment." The PCF then filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. The *670 trial court rendered judgment on January 23, 1998, denying all post-trial motions filed by the parties and again adopting the jury's verdict of October 8, 1997.
The PCF suspensively appealed the judgments of November 5, 1997, and January 23, 1998, assigning the following specifications of error:
1. The trial court erred in charging the jury on the doctrine of res ipsa loquitur, since plaintiffs' own expert testified that the injuries suffered by Richard Jake Baumy can and do occur in the absence of negligence.
2. Since plaintiffs' expert, Dr. Piver, had not practiced obstetrics since 1986, plaintiffs were unable to establish an essential element of their cause of action, namely the standard of care in existence in 1991, the time of the alleged malpractice.
3. Plaintiffs failed to prove that Dr. Thomas breached the standard of care in 1991, as required to make a prima facie medical malpractice case under La. R.S. 9:2794.
4. Plaintiffs failed to establish that any breach of the standard of care by Dr. Thomas was a proximate cause of injuries that Richard Jake Baumy would not have otherwise incurred, and, as such, failed to prove a prima facie case pursuant to La. R.S. 9:2794.
Plaintiffs answered the appeal by the PCF alleging that the appeal was frivolous and had been filed solely for the purposes of delay. Plaintiff requested that the PCF be ordered to pay appropriate damages in accordance with La.Code Civ. P. art. 2164.[1] The plaintiffs also separately appealed the judgment of January 23, 1998, urging the following assignments of error:
1. The trial court erred in allowing the confusing and prejudicial jury interrogatories regarding the assignment or assessment of fault to unnamed and unknown "any other persons" because there was absolutely no evidence or testimony introduced at trial to support a finding that any other person deviated from any standard of care and no reasonable jury could find that there were "any other persons" at fault for the damages incurred by Richard Jake Baumy and the interrogatories allowed the jury to improperly allocate forty-nine (49%) percent fault to "any other persons".
2. The trial court erred in denying [plaintiffs'] Motion for Judgment Notwithstanding the Verdict because the jury's allocation of forty-nine percent (49%) fault to "Any other persons" was clearly contrary to the evidence presented in and the law governing the case.
3. The trial court erred in denying [plaintiffs'] Motion for Judgment Notwithstanding the Verdict and finding that Dr. Thomas was not solidarily liable for the percentage of damages allocated to the "Any other persons" because all the evidence and testimony at trial established that he was an original tortfeasor as his injury causing malpractice preceded any possible subsequent malpractice or negligence and nothing supports the scenario that the hospital could be deemed the "Any other persons".
Complicating matters in this case is the companion appeal filed by the PCF in No. 98 CA 2440 regarding a settlement that was entered into by the plaintiffs and Dr. Thomas subsequent to the jury's verdict. *671 The issues concerning this second appeal by the PCF will be addressed in a separate unpublished opinion to be rendered this same day. See Bradbury v. Thomas, No. 98 CA 2440 (La.App. 1 Cir. 9/24/99), 744 So.2d 228. Our discussion of the two appeals in the instant matter follows.

I. APPEAL BY THE LOUISIANA PATIENTS' COMPENSATION FUND RES IPSA LOQUITUR
In its first assignment of error, the PCF asserts that because the plaintiffs failed to prove that the injuries suffered by baby Richard do not occur in the absence of negligence, the trial court's inclusion of the instruction on the doctrine of res ipsa loquitur was erroneous and prejudicial. The PCF further argues that this constitutes reversible error.
The plaintiffs counter that "the overall evidence, both direct and circumstantial, did not point so overwhelmingly in favor of the health care provider that no rational juror could find in [their] favor." Thus, the plaintiffs assert that the trial court was under a duty, pursuant to the rule of Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989), to charge the jury on the doctrine of res ipsa loquitur. We agree.
A trial judge has a duty to charge the jury as to the law applicable in a case. Haydel v. Hercules Transport, Inc., 94-1246, p. 17 (La.App. 1 Cir. 4/7/95), 654 So.2d 418, 429, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019. The adequacy of jury instructions must be determined in light of the instructions as a whole. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 36 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 488, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. It is the trial judge's responsibility to reduce the possibility of confusing the jury, and he (she) may exercise the duty to decide what law is applicable. Sparacello v. Andrews, 501 So.2d 269, 277 (La.App. 1 Cir.1986), writ denied, 502 So.2d 103 (La.1987). An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that jury instructions were so erroneous as to be prejudicial. Daigle v. Legendre, 619 So.2d 836, 839 (La.App. 1 Cir.), writ denied, 625 So.2d 1040 (La. 1993).
The doctrine of res ipsa loquitur involves a plaintiff's use of circumstantial evidence to meet the burden of proving negligence by a preponderance of the evidence. As noted by the Louisiana Supreme Court in Cangelosi, in order to utilize the doctrine, the plaintiff must establish a foundation of facts on which it may be applied.
Negligence on the part of the defendant may be proved by circumstantial evidence alone when that evidence establishes, more probably than not, that the injury was of a kind which ordinarily does not occur in the absence of negligence, that the conduct of the plaintiff or of a third person was sufficiently eliminated by the evidence as a more probable cause of the injury, and that the indicated negligence was within the scope of the defendant's duty to the plaintiff....
In order to utilize the doctrine of res ipsa loquitur the plaintiff must establish a foundation of facts on which the doctrine may be applied. The injury must be of the type that does not ordinarily occur in the absence of negligence. In other words, "the event must be such that in light of ordinary experience it gives rise to an inference that someone must have been negligent".... The plaintiff does not have to eliminate all other possible causes or inferences, but must present evidence which indicates at least a probability that the injury would not have occurred without negligence.
The facts established by plaintiff must also reasonably permit the jury to discount other possible causes and to conclude it was more likely than not that the defendant's negligence caused the injury.... The inference of negligence points to the defendant when the conduct *672 of others is eliminated as a more probable cause. The plaintiff must show not only that an accident occurred or that the accident was caused by the negligence of someone, but also that the circumstances warrant an inference of defendant's negligence.
The plaintiff must also establish that the defendant's negligence indicated by the evidence falls within the scope of his duty to the plaintiff. This is often, but not necessarily, proved by a showing that the defendant was in exclusive control of the injury-causing instrumentality.
Use of the doctrine of res ipsa loquitur in a negligence case, as in any case involving circumstantial evidence, does not relieve the plaintiff of the ultimate burden of proving by a preponderance of the evidence all of the elements necessary for recovery. When all the evidence is in, the question for the jury is whether the preponderance of the evidence is with the plaintiff.
The doctrine of res ipsa loquitur is applied after all of the evidence has been presented. The trial judge initially determines whether the jury could reasonably infer from the circumstances that the plaintiff's injury was caused by the negligence of the defendant. If the judge determines that reasonable minds could reach different conclusions, it is the function of the judge to instruct the jury on the doctrine, and it is the function of the jury to decide whether to draw the inferences or not.
Cangelosi, 564 So.2d at 665-66 (citations and footnotes omitted).
Following our review of the record in the instant case, we are satisfied that the plaintiffs have met their burden of establishing "a foundation of facts on which the doctrine [of res ipsa loquitur] may be applied." Id. at 666. Reasonable minds could differ as to whether Dr. Thomas' negligence caused the injuries sustained by baby Richard. Thus, the trial court was required, under the Cangelosi rule, to present the issue to the jury and instruct the jury on the doctrine of res ipsa loquitur. Id. at 667; See also Denton v. Critikon, Inc., 95-1602, pp. 6-8 (La.App. 1 Cir. 5/10/96), 674 So.2d 1169, 1173-74. This assignment of error is without merit.

BURDEN OF PROOF IN MEDICAL MALPRACTICE ACTION
In its last three assignments of error, the PCF challenges the substance of the plaintiffs' case in relation to what is required by La. R.S. 9:2794. As provided, in pertinent part, by La. R.S. 9:2794 A, a plaintiff in a medical malpractice action bears the following burden of proof:
A. In a malpractice action based on the negligence of a physician ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
. . . .

*673 C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician .... The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, optometrist's, or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
It is well settled that the resolution of each of these inquiries involves a determination of fact and should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991). In reviewing the factual findings of the trier of fact, an appellate court can only reverse when (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court and (2) it further determines that the record establishes that the findings are manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
This court has previously held that in medical malpractice actions, opinions from medical experts are necessary to determine both the applicable standard of care and whether that standard was breached. Lefort v. Venable, 95-2345, 95-2346, p. 4 (La.App. 1 Cir. 6/28/96), 676 So.2d 218, 220. However, the Louisiana Supreme Court has recognized that there are situations in which expert testimony is not necessary.[2] When medical experts are called to testify, the views of such expert witnesses are persuasive, although not controlling, and any weight assigned to their testimony by the trier of fact is dependent upon the expert's qualifications and experience. The trier of fact must assess the testimony and credibility of all the witnesses and make factual determinations regarding these evaluations. Hoot v. Woman's Hospital Foundation, 96-1136, p. 6 (La.App. 1 Cir. 3/27/97), 691 So.2d 786, 789-90, writ denied, 97-1651 (La.10/3/97), 701 So.2d 209. Where there are contradictory expert opinions concerning compliance with the applicable standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Lefort, 95-2345 at 4, 676 So.2d at 221.

Standard of Care
In assignment of error number two, the PCF argues that the plaintiffs failed to prove the obstetrical standard of practice in effect in 1991 because their expert witness had not practiced obstetrics since 1986. The plaintiffs cite the case of Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378 (La.1992) in support of their position that La. R.S. 9:2794 does not require that a medical expert be actively engaged in practicing the particular specialty about which he/she will testify. We agree with plaintiffs and believe that the Piazza case is controlling here.
Initially, we note that La.Code Evid. art. 702 provides for the qualification of expert witnesses whose testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Trial judges have great discretion in determining the qualifications of experts and the effect and weight to be given expert testimony. Absent a clear abuse of this discretion, the trial court's rulings on the qualification of a witness as an expert will not be disturbed. Misenheimer v. West Baton Rouge Parish Sheriffs Office, 95-2427, pp. 2-3 (La.App. 1 Cir. 6/28/96), 677 *674 So.2d 159, 160, writ denied, 96-1853 (La.10/25/96), 681 So.2d 371.
In Piazza, the Louisiana Supreme Court granted writs to review a decision by this court on the same issue that is before us now. Piazza involved a case of chiropractic malpractice wherein the plaintiff filed suit after suffering a ruptured disc following, allegedly negligent treatment by a local chiropractor. When the case was presented to this court on appeal, we concluded that the plaintiffs expert should not have been allowed to testify because he was not actively practicing at the time of the alleged malpractice and had never practiced in Louisiana or in a locale similar to the area in question. Piazza v. Behrman Chiropractic Clinic, Inc., 588 So.2d 1190, 1194 (La.App. 1 Cir.1991), reversed, 601 So.2d 1378 (1992).
In reviewing our decision, the Louisiana Supreme Court noted that La. R.S. 9:2794 does not require the expert to be actively practicing in the particular specialty about which he/she will testify.
The statute [referring to La. R.S. 9:2794] merely states that "the plaintiff shall have the burden of proving [t]he degree of knowledge and skill possessed or the degree of care ordinarily exercised by ... [physicians] licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances." The "actively practicing" requirement refers to the defendant [physician] and those practicing ... medicine in his or her community, not to the expert. Nowhere does La.R.S. 9:2794 state that in order to demonstrate the appropriate degree of care owed by the defendant [physician], the expert who testifies must be licensed in Louisiana or actively practicing in this state. The expert, of course, must satisfy the trial judge that he or she is qualified to give testimony regarding the applicable standard of care.
Piazza, 601 So.2d at 1382. The trial court had determined that "based upon his numerous years of experience, practice, and consultation in the field of chiropractic medicine," the plaintiff's witness qualified as an expert regardless of his inactive practice. The Louisiana Supreme Court agreed, finding that this decision by the trial court was not erroneous. Id.
Similarly, in the instant case, the plaintiffs' expert witness, Dr. Julius Piver, had numerous years of experience, practice, and consultation in the field of obstetrics. According to Dr. Piver, he graduated from medical school in 1952 and is board certified in obstetrics. He completed his residency in obstetrics and gynecology from 1953 to 1956, and then began a solo practice. From 1963 to 1980, he practiced obstetrics and gynecology with a group of other doctors. In 1980, he returned to solo practice and continued in the practice of obstetrics and gynecology until 1986, at which time he began practicing only gynecology. At the time of the trial of this matter, Dr. Piver was still practicing as a gynecologist. He indicated that he sees patients three times a week and performs surgery.
In addition to his private practice as an obs tetrician/gynecologist, Dr. Piver served as the chairperson of the obstetrics department at the Washington Hospital Center. During his tenure there, he was responsible for the training of over 80 residents in the care and delivery of babies. Throughout his years of practice, he was responsible for the delivery of approximately 23,000 to 24,000 babies.
When asked what he has done to keep up with the current trends in obstetrics since he last delivered a baby in 1986, Dr. Piver indicated that he reads approximately 15 to 18 journals monthly regarding obstetrics and gynecology. Moreover, Dr. Piver testified that over the past 10 to 12 years, he has been accepted as an expert in the field of obstetrics and gynecology and has testified for both plaintiffs and defendants in malpractice cases.
*675 When Dr. Piver was offered as an expert in the field of obstetrics and gynecology, counsel for Dr. Thomas objected to Dr. Piver's qualifications, urging that he was not qualified to express an opinion as to the standard of care in 1991. The trial court accepted Dr. Piver as an expert, noting "[y]ou have got education, skills, experience, all kinds of matters that are involved in this and I think that it's clear that he should be accepted, but these are matters that certainly go to the weight." A review of the record in this case reveals no abuse of discretion by the trial court in this finding. Thus, with Dr. Piver's testimony, the plaintiffs clearly met the burden of proving the applicable standard of care. The PCF's second assignment of error lacks merit.

Breach of the Standard of Care
In its third assignment of error, the PCF argues that the plaintiffs failed to prove that Dr. Thomas breached the standard of care in 1991, as required of them in La. R.S. 9:2794. Based on our review of the record, we disagree. It is clear from the record that the plaintiffs presented substantial evidence and proved by a preponderance of the evidence that Dr. Thomas breached the applicable standard of care in delivering baby Richard.
During his extensive testimony regarding the specific ways in which Dr. Thomas breached the applicable standard of care in this case, Dr. Piver noted that, in his opinion, "Dr. Thomas deviated from the acceptable standard of care ... for several reasons." First, Dr. Piver recognized that baby Richard was in an occiput posterior presentation when labor began. According to Dr. Piver, the pain associated with an occiput posterior delivery is much greater than the pain associated with a normal anterior occiput delivery. Dr. Piver indicated that a trained obstetrician should be able to gently use forceps to rotate a baby around to the safer anterior occiput position. However, he noted that if this "trial of forceps" does not work, the obstetrician should stop and prepare for a cesarean section. According to the medical records, Dr. Thomas failed to attempt to rotate baby Richard into an anterior occiput position.
Dr. Piver also opined that Dr. Thomas breached the standard of care by failing to properly diagnose "arrest of descent." The labor and delivery records indicated that baby Richard had stopped moving, and his mother's contractions were about the same frequency and duration. According to the records, there was basically no progress in labor for approximately 6 hours. Dr. Piver testified that Dr. Thomas should have recognized from these signs that something was wrong.
The next issue that Dr. Piver addressed was the use of forceps by Dr. Thomas in the delivery of baby Richard. Dr. Piver consistently referred to the necessity of being gentle when using forceps. Dr. Piver also indicated that it is critical for an obstetrician to know the station of the baby at the time the forceps are applied. According to Dr. Piver, Dr. Thomas breached the standard of care by failing to adequately and correctly determine the station of baby Richard prior to applying the forceps.
A committee opinion published by the American College of Obstetricians and Gynecologists ("ACOG") defines station as "[t]he relationship of the estimated distance, in centimeters, between the leading bony portion of the fetal head and the level of the maternal ischial spines." Dr. Piver explained that the ischial spines were used as station 0 and that anything above the spines was a minus and anything below the spines was a plus. Therefore, the baby is at -3, -2, and then -1 station as it is going into the pelvis. When the baby gets down to the floor of the pelvis, the perineum, the baby is at +3 station. Dr. Piver testified that, absent an emergency, the obstetrician should wait until the baby is at + 3 station before delivery.
According to the record, Dr. Thomas used the biparietal diameter of the head to *676 determine station rather than the leading bony part as is commonly used in practice. In fact, the nurse who was assisting Dr. Thomas in this delivery used the definition of station as it is found in the ACOG committee opinion. Dr. Piver indicated that this could result in a 1-2 centimeter difference when determining station. When asked to explain the different types of deliveries that can occur with forceps, Dr. Piver testified as follows:
Well, high forceps is trying to get the forceps on the head when it's not engaged in the pelvis. When it is out of the pelvis, -3 or higher. Mid-forceps by definition is when the head is at the spines or one centimeter above, one centimeter below. Mid means mid-pelvic. Low forceps means it is at +2 or +3. It's on the perineum. Outlet forceps means it's almost out. The outlet where you are gently guiding it.
Based on his review of the medical records, including Dr. Thomas' own delivery note that was prepared some 40 minutes after the delivery of baby Richard, Dr. Piver opined that this delivery was a midforceps delivery as opposed to a low-forceps delivery as argued by Dr. Thomas. Dr. Thomas' note stated, in part, "[s]he dilated completely and after pushing for an hour and a half with no descent from the +1 station with an occiput posterior presentation the forceps were applied in delivery of the baby to the perineum where the forceps were removed." Dr. Piver indicated that by definition, this was a mid-forceps delivery. Dr. Piver noted that according to the ACOG, a mid-forceps delivery is only acceptable under very unusual circumstances such as the sudden onset of severe fetal or maternal compromise, and even then, it should be attempted while preparing for a cesarean section. There was nothing in the records to indicate that there was any fetal or maternal compromise in this case.
In addition to Dr. Thomas improperly applying the forceps to baby Richard when he was too high in the birth canal, there is also evidence in the record that Dr. Thomas used excessive force in pulling baby Richard out of his mother's womb. Baby Richard's father testified that he was in the birthing room during the delivery. He indicated that he saw Dr. Thomas position his knee against the table leg, and then Dr. Thomas' leg came up against the table as he was pulling with the forceps. When asked about this scenario, Dr. Piver testified as follows:
Q. Doctor, if I were to tell you that some physicians would testify that it's okay for an obstetrician with the forceps in hand delivering the baby, that it's okay for the physician, the obstetrician, to brace himself with one foot on a cross bar on the table while pulling, would you have any problem with that?
A. Absolutely unacceptable.
Q. Why, Doctor?
A. If you have to exert that much force, you shouldn't be using forceps.
Q. Okay.
A. It's just not acceptable. It's too much potential trauma to the mother and the baby. Anybody that says otherwise is in the wrong speciality [sic] because thiswe are dealing with a precious cargo here not to get maudlin about it, but this baby is depending on us to get it out of there in a healthy, safe fashion. If you're going to be yanking this thing out of there like that, that's not the way to do it.
Dr. Piver also stated that the "considerable amount of blood loss" suffered by baby Richard's mother in connection with her episiotomy was yet another indication that too much force was used in the delivery of baby Richard.
We have thoroughly reviewed the record in this case and are satisfied that there was a reasonable factual basis to support the jury's finding that Dr. Thomas breached the applicable standard of care in the delivery of baby Richard. This factual finding by the jury was not manifestly erroneous and will not be disturbed by this *677 court on appeal. The evidence presented to the jury regarding Dr. Thomas' actions and/or failure to act during the delivery of baby Richard was both substantial and credible. The plaintiffs clearly established by a preponderance of the evidence that Dr. Thomas breached the applicable standard of care in the delivery of baby Richard. This assignment of error is without merit.

Causation
In its final assignment of error, the PCF argues that the plaintiffs failed to establish a causal connection between the forceps delivery and baby Richard's epidural hematoma. Plaintiffs assert that they presented adequate evidence to support a finding by the jury that Dr. Thomas' breach of the applicable standard of care caused the injuries sustained by baby Richard. For the reasons that follow, we agree with the plaintiffs.
According to the medical records introduced at trial, baby Richard sustained a left parietal skull fracture with an intracranial epidural hematoma and an extracranial cephalhematoma on both sides of the fracture, all of which were causally related to his birth. One of the experts called by plaintiffs, Dr. Kenneth Ward, testified regarding the issue of causation. Dr. Ward, a radiologist on staff at Children's Hospital in New Orleans, Louisiana, was asked to review several different diagnostic films that had been taken of baby Richard's skull from the time of birth through the date of his surgery. Dr. Ward indicated that all of the studies that he reviewed were consistent with his opinion that all of the injuries sustained by baby Richard were caused at birth. Dr. Ward testified as follows regarding his opinion:
So I believe that during the birth process the left parietal bone was deformed, during that deformity it broke. When it broke or during the deformation, the tissues that are applied to the outside of that bone, both on the inside and outside of the head, separated off of the tissue and the child suffered a bleed on the inside and outside of that piece of bone. The outside piece calling it a cephalhematoma. The inside piece calling it an epidural hematoma. The child had surgery, the epidural hematoma was evacuated.
Dr. Ward testified as follows regarding the incidence of the type of injuries sustained by baby Richard in this case.
Q. Okay. You have said that cephalhematomas are not uncommon. Is that right?
A. No. Yes, that is correct. We see cephalhematomas on a fairly regular basis in our practice.
Q. What causes cephalhematomas generally?
A. Well, exactly what I just described a deformity of the bone and it's almost always the parietal bone. Because of it's size and location it's the bone that is most likely to be deformed during the birth process. Just during the birth process that bone is bent and then again bleeding occurs into that space and we see a cephalhematoma on the outside.
Q. What about skull fractures, Doctor, how common are those in your experience?
A. Basically in my experience and I would like to let you all know that our experience is a little bit skewed in that we don't have a delivery system at our hospital. So we don't see every newborn and every newborn skull say like at a large delivery hospital. We see the patients that have developed subsequent problems and need further intervention and wind up coming to our hospital. So in the twelve years that I have been in my practice at Children's Hospital of those patients who haveI have seen with cephalhematomas very few of them have had fractures.
Q. What about epidural hematomas?
A. In regards to?
Q. The
A. Cephalhematomas?

*678 Q. No, in regards to the incidence of it?
A. The incidence of intracranial epidurals during, secondary to birth?
Q. Yes.
A. Basically, I can count on several fingers the incidence of epidural hematomas that I have seen secondary to the birth process.
Q. So it's a very, very rare occurrence, is it not?
A. Yes.
Q. Now if I were to tell you that Ritchie was delivered with forceps, would that surprise you based upon the films that you looked at?
A. No, it wouldn't. Based on my experience and also again on basically what we know in our literature the incidence of these types of injuries increases when forceps are applied.
Q. So if I were to tell you that Ritchie had a traumatic forceps delivery at birth, that would be consistent with what you observed on all of the films you have talked to this jury about?
A. Yes.
In addition to Dr. Ward's opinion on the issue of causation, the jury also had the benefit of the testimony of Dr. Steven Mark Donn. Dr. Donn was accepted by the court as an expert in the field of pediatrics, neonatology, and perinatology. Dr. Donn testified that in his opinion, all of the injuries sustained by baby Richard were "traumatically induced injuries that occurred at the time of Richard's birth." Dr. Donn further opined that the injuries sustained by baby Richard "were the result of a combination of the abnormal position and the use of the forceps." When asked to explain his opinion regarding causation, Dr. Donn indicated as follows:
A. There were a number of factors that were present in the medical records, which taken together, allow me to answer the question. Number one, the baby had an abnormal position. The occiput posterior position is one that has a very high association with difficulties and with traumatic injuries. Secondly, there was the use of forceps. In addition, there is ample evidence in the medical records that there was certainly soft tissue trauma sustained by the baby, the descriptions of the bruising and the abrasions, the difficulties with the facial nerve, which is very susceptible to traumatic injury with the use of forceps. And as well, there was an extension, the mom's laceration in the birth canal. All of these are very suggestive that this was not a normal delivery, but one in which a significant amount of force had been exerted upon the baby. And when we add into that the skull fracture and the epidural hematoma beneath the area of the external trauma.
Q. Explain external trauma?
A. The cephalhematoma which developed it's a very strong hand and glove situation to suggest that this was indeed a traumatically induced injury.
Dr. Donn concluded by noting that if Dr. Thomas had performed a cesarean section in delivering baby Richard, the baby would not have sustained an epidural hematoma. Dr. Piver also testified regarding this issue stating that the injuries to baby Richard would have been avoided had Dr. Thomas taken the baby by cesarean section.
A thorough review of the record reveals that the jury's finding regarding causation was reasonable and based on credible and sufficient evidence. The evidence shows that the plaintiffs overwhelmingly proved that baby Richard's injuries were causally related to the traumatic delivery. Thus, this assignment of error lacks merit.

II. APPEAL BY KIM BRADBURY AND RICHARD BAUMY
In their appeal of the trial court's judgment of January 23, 1998, the plaintiffs assert three assignments of error, all of which basically address the jury's apportionment of 49 percent fault to "Any *679 other person."[3] In their first assignment of error, the plaintiffs argue that the trial court erred in including jury interrogatories that asked the jury to assess fault to unnamed and unknown persons. The record reveals that the plaintiffs timely objected to the interrogatories as being misleading, confusing, and potentially very prejudicial. The trial court noted the plaintiffs' objection, but did not strike the interrogatories or alter them in any way. After hearing all of the evidence, the jury ultimately assessed 51 percent fault to Dr. Thomas and 49 percent fault to "Any other person."
The jury interrogatories in question provided as follows:
10. Was any other person the proximate cause of damages to plaintiffs?
 Yes X No _____
(Proceed to number 11.)
11. Indicate the percentages of the negligence or fault, if any, of the following which you have indicated above legally caused damages to plaintiffs. Any particular percentage may be as low as 0% or as high as 100%. Your answers may not total more than 100%.

Dr. Clinton L. Thomas, Jr. 51 %
Any other person 49 %
Kim Bradbury Baumy ____%
Richard Baumy (father) ____%

This court has previously recognized that an appellate court's review of a jury's answers to its interrogatories is governed by the manifest error standard of review. Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089, p. 5 (La.App. 1 Cir. 6/23/95), 657 So.2d 1066, 1069, writ denied, 95-1883 (La.11/17/95), 663 So.2d 720. In Diez, we held:
If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error.
Diez, 94-1089 at 5, 657 So.2d at 1070 (citation omitted). We also held that in determining the adequacy of jury interrogatories, the pertinent law governing the specific type of case at hand should be reviewed. Id. Thus, in the instant case, we turn to the law regarding comparative fault to determine if the jury interrogatories were so misleading or confusing as to constitute reversible error.
Louisiana Civil Code article 2323 provides, in pertinent part, as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
This statute is procedural in nature and should be applied retroactively. Petroleum Rental Tools, Inc. v. Hal Oil & Gas Co., Inc., 95-1820, 95-1821, p. 6 (La. App. 1 Cir. 8/22/97), 701 So.2d 213, 217, rehearing denied, writ dismissed, 97-3088 (La.2/10/98), 706 So.2d 982. Thus, Article 2323 would apply to the facts of this case and mandate that the degree or percentage of fault of all persons, both parties and non-parties, be determined.
*680 However, in Haney v. Francewar, 588 So.2d 1172 (La.App. 1 Cir.1991), we recognized that where non-parties or phantom tort-feasors are claimed by a defendant to be at fault in causing damages to the plaintiff, the burden shifts to the defendants to show not only the fault of the non-parties or phantom tort-feasors, but the percentage thereof. Haney, 588 So.2d at 1178. We further noted that "[t]his reasoning applies with even greater force when the plaintiff has not sued other persons, and/or has not made factual allegations of negligence of others." Id. Therefore, despite the mandate of Article 2323, defendants are not relieved of the burden of proving that the phantom tortfeasor's conduct was a causative factor of the damages sustained and was a breach of duty to the plaintiff. See also Devereux v. Allstate Insurance Company, 557 So.2d 1091, 1095-96 (La.App. 2 Cir.1990).
In answering plaintiffs' petition for damages, Dr. Thomas alleged that any recovery by the plaintiffs "must be reduced by the proportionate or comparative fault of any entity whose negligence or fault contributed to plaintiffs' damages." However, Dr. Thomas failed to carry his requisite burden of proof. By including "Any other persons" on the jury interrogatories, the trial court created confusion and misled the jury into returning a verdict that was clearly contrary to the evidence and applicable law. There is absolutely nothing in the record to support the finding by the jury that "Any other person" was 49 percent at fault in causing the injuries sustained in this case. Thus, we find that it was reversible error for the trial court to include "Any other person" on the jury interrogatories.
The plaintiffs further urge this court to assess 100 percent of the fault for baby Richard's injuries to Dr. Thomas. They assert that "the record establishes Dr. Thomas' liability by a clear preponderance of the evidence and there are no substantial conflicts in testimony." We agree with plaintiffs' argument in this regard. Not only does the record clearly support the imposition of liability to Dr. Thomas, but also the jury clearly found that neither Kim Bradbury nor Richard Baumy was "guilty of conduct which proximately caused the damages sought in this case." Thus, as baby Richard's parents were found to be free from fault, and, as we have indicated, there was no evidence of any negligence by "Any other person," it follows that Dr. Thomas stands alone on the issue of liability and must be held responsible for 100 percent of the damages sustained in this case. Therefore, we reverse the judgment of the trial court allocating 49 percent fault to "Any other person." We further amend the judgment to reflect that Dr. Thomas is 100 percent at fault in causing the injuries sustained by baby Richard.

DECREE
For the above and foregoing reasons, the judgment of the trial court allocating 49 percent fault to "Any other person" is reversed. The judgment is amended, and Dr. Thomas is assessed with 100 percent fault. Costs in the amount of $9,688.00 are assessed against intervenor/appellant, the Louisiana Patients' Compensation Fund.
REVERSED IN PART, AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] We note that appeals are favored in our law and penalties for the filing of a frivolous appeal will not be imposed unless they are clearly due. Cavin v. Harris Chevrolet, Inc., 95-1878, p. 5 (La.App. 1 Cir. 5/10/96), 673 So.2d 654, 658. We have thoroughly reviewed the record in this matter and are satisfied that this appeal by the PCF was not taken solely for the purpose of delay. Thus, damages for frivolous appeal are not warranted, and this issue will not be addressed any further. See Hessick v. Petro Publications, Inc., 96-0034, p. 7 (La.App. 1 Cir. 11/8/96), 684 So.2d 466, 472, writ denied, 97-0332 (La.3/21/97), 691 So.2d 89.
[2] In Pfiffner v. Correa, 94-0924, 94-0963, 94-0992, p. 9 (La.10/17/94), 643 So.2d 1228, 1233, the Louisiana Supreme Court noted that expert testimony is not necessary where the objective evidence at trial is such that a lay person can infer negligence from the facts, such as when a physician commits an obviously careless act, including fracturing a leg during examination, amputating the wrong limb, dropping a knife, scapel, or acid on a patient or leaving a sponge in the patient's body.
[3] Because we find that plaintiffs' first assignment of error has merit and consequently reverse the trial court's allocation of fault, the plaintiffs' second and third assignments of error are rendered moot and will not be addressed.