981 So.2d 686 (2007)
Evans R. THIBODAUX, Jr., Gene L. Thibodaux, Patricia T. Naquin and Felicia T. Bader
v.
LEONARD J. CHABERT MEDICAL CENTER, Formerly South La. Medical Center, Jeffery J. Joseph, M.D., John A. Dean, M.D., John Dampeer, M.D., Thomas W. Downes, M.D., Jose' Mena, M.D., and Chris P. Patronella, M.D.
No. 2006 CA 0599-R.
Court of Appeal of Louisiana, First Circuit.
September 14, 2007.
Writ Denied December 7, 2007.
Thomas A. Gennusa, Metairie, Counsel for Plaintiff/Appellee Evans P. Thibodaux, Jr.
Gregory C. Weiss, Mandeville, Counsel for Defendant/Appellant Leonard J. Chabert Medical Center.
*688 Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
In this medical malpractice action, Leonard J. Chabert Medical Center (Chabert) appeals the trial court's judgment finding it liable for the wrongful death of Flavia Marcel Thibodaux. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
Flavia Marcel Thibodaux was admitted to Chabert[1] on April 11, 1988, for abdominal pain. On April 13, 1988, staff general surgeon Dr. John Dampeer and fifth-year resident Dr. Chris Patronella performed an exploratory laparotomy[2] on Mrs. Thibodaux, which revealed a necrotic sigmoid volvulus (twisted colon) and a large pseudoaneurysm of her aorta.[3] During the surgery, Drs. Dampeer and Patronella performed a sigmoid resection with primary end-to-end anastomosis of the colon; however, they did not remove the pseudoaneurysm. Rather, Drs. Dampeer and Patronella decided based on the circumstances, including the risk of potential contamination of the operative field and Mrs. Thibodaux's co-morbidity factors, to let Mrs. Thibodaux recuperate from the abdominal surgery and to resect the pseudoaneurysm at a later date.
In the following months, Mrs. Thibodaux reported to Chabert emergency room several times with complaints of passing blood from her rectum. During this time, Mrs. Thibodaux was admitted to Chabert three times and numerous tests were conducted. However, the staff at Chabert was unable to diagnose the cause of Mrs. Thibodaux's bleeding. On June 18, 1988, Mrs. Thibodaux reported to Chabert emergency room with significant bleeding from her rectum, necessitating a blood transfusion. Dr. John Dean, a fifth-year resident, oversaw Mrs. Thibodaux's care, and after numerous tests, determined that Mrs. Thibodaux must have an aortaenteric fistula of some kind, which needed to be addressed operatively. Drs. Dampeer and Dean performed surgery on June 23, 1988, which revealed a large pseudoaneurysm of the aorta and a communication, or an aortaenteric fistula, between the pseudoaneurysm and the suture line from the April surgery. Mrs. Thibodaux was in surgery for approximately eleven hours, went into recovery, but died on April 24, 1988.
Thereafter, Evans Thibodaux, Gene Thibodaux, Patricia Naquin, and Felicia Bader filed a petition against Chabert and the surgeons responsible for Mrs. Thibodaux's care seeking wrongful death and survival damages. However, pursuant to an exception of prescription filed by Chabert, plaintiffs' survival claims were dismissed, as well as the wrongful death claims of Gene Thibodaux, Patricia Naquin, and Felicia Bader. Thereafter, a bench trial was held on March 28 and 29, 2005. At the beginning of trial, the parties agreed to dismiss the individual surgeons from the suit, thereby leaving Chabert as the only named defendant.
In a judgment dated August 8, 2005, the trial court found in favor of Evans Thibodaux and against Chabert and awarded Mr. Thibodaux $203,595.44 in damages, *689 which included $200,000.00 in general damages and $3,595.44 in funeral expenses, plus costs and judicial interest from May 21, 1993. Thereafter, Mr. Thibodaux filed a motion for new trial to correct the judgment to provide for the accrual of interest from June 23, 1989, rather than from May 21, 1993. Additionally, Chabert filed a motion to appeal the August 8, 2005 judgment. The trial court subsequently granted the motion for new trial and amended the judgment on December 29, 2005, to reflect judicial interest due from June 23, 1989; however, Chabert did not appeal from the amended judgment. Accordingly, this court ex propio motu issued a rule to show cause, which was maintained on July 24, 2006, and dismissed Chabert's appeal for lack of jurisdiction in accordance with La. C.C.P. art.2088. However, on January 12, 2007, the Louisiana Supreme Court granted writs in this matter, reversed this court's ruling dismissing Chabert's appeal, and remanded the matter to this court for briefing, argument, and opinion.

DISCUSSION
In order to prevail in a medical malpractice action, a plaintiff is required to establish: (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty; (2) that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) that as a proximate result of this lack of knowledge or skill or failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. See La. R.S. 9:2794 A; Lieux v. Mitchell, 06-0382, pp. 10-11 (La.App. 1st Cir.12/28/06), 951 So.2d 307, 314, writ denied, 07-0905 (La.6/15/07), 958 So.2d 1199. In other words, the plaintiff must establish the standard of care applicable to the doctor, a breach of that standard of care, and that the substandard care caused an injury the plaintiff would otherwise not have suffered. Lieux, 06-0382 at p. 11, 951 So.2d at 314.
The physician's conduct is always evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with the benefit of hindsight. Lefort v. Venable, 95-2345, p. 4 (La.App. 1st Cir.6/28/96), 676 So.2d 218, 220. In medical malpractice actions, opinions from medical experts are necessary to determine both the applicable standard of care and whether that standard was breached. Lefort, 95-2345 at p. 4, 676 So.2d at 220.
When medical experts are called to testify, the views of such expert witnesses are persuasive, although not controlling, and any weight assigned to their testimony by the trier of fact is dependent upon the facts on which the opinion is based as well as the expert's professional qualifications and experience. Salvant v. State, 05-2126, p. 14 (La.7/6/06), 935 So.2d 646, 656; Bradbury v. Thomas, 98-1678, p. 8 (La.App. 1st Cir.9/24/99), 757 So.2d 666, 673. The trier of fact must assess the testimony and credibility of all the witnesses and make factual determinations regarding these evaluations. Hoot v. Woman's Hospital Foundation, 96-1136, p. 6 (La.App. 1st Cir.3/27/97), 691 So.2d 786, 789-790, writ denied, 97-1651 *690 (La.10/3/97), 701 So.2d 209. When the experts' opinions are in conflict concerning compliance with the applicable standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Lefort, 95-1472 at p. 4, 676 So.2d at 221.
In the instant case, Chabert asserts that the trial court erred in finding the testimony of Mr. Thibodaux's expert, Dr. James Shamblin, legally sufficient to prove the standard of care of general surgeons and that the surgeons at Chabert breached that standard of care.[4] At trial, Dr. Shamblin, a board-certified general surgeon, stated that he reviewed Mrs. Thibodaux's medical records from Chabert from April 11, 1988 through June 24, 1988. According to these records, Mrs. Thibodaux's past surgical history included repair of an abdominal aortic aneurysm with an aortobifemoral graft. The records further indicate that Mrs. Thibodaux underwent an exploratory laparotomy on April 13, 1988, whereupon the surgeons discovered a sigmoid volvulus and a pseudoaneurysm of the left limb of the aortobifemoral graft. Dr. Shamblin explained that a sigmoid volvulus is a twisting of the colon, which according to the surgical notes, was corrected by an end-to-end anastomosis, a procedure that cuts out the twisted portion of the colon and resects the remaining two ends of the intestines. Dr. Shamblin defined a pseudoaneurysm as an enlargement of a blood vessel, much like a blister. Additionally, he stated that while a true aneurysm is fusiform and involves all three walls of the vessel, a pseudoaneurysm is saccular and only involves two walls of the vessel. Dr. Shamblin stated that according to the medical records, the surgeons allowed the pseudoaneurysm, which was within the perimeter of the intestines and about eight to ten centimeters in diameter, or about the size of an orange, to remain adjacent to the suture from the anastomosis.
Dr. Shamblin explained that as a blood vessel, a pseudoaneurysm pulsates, and when placed against a suture line on the fixed colon, the pulsating pseudoaneurysm would cause the development of a tube or tract, called an aortaenteric fistula, between the pseudoaneurysm and the intestines. Dr. Shamlin stated that "enteric" refers to the antheral intestines, and that any fistula that is enteric in nature means that it communicates with some part of the gastrointestinal tract; the sigmoid portion of the colon was involved in this case, making it an aortacolonic fistula, which is a subcategory of aortaenteric fistulas. Such a fistula allows blood to transfer from the pseudoaneurysm into the intestines and through the rectum, as ultimately occurred in this case.
According to Dr. Shamblin, the placement of the suture line, which was contaminated with bacteria from the anastomosis, adjacent to the pulsating psuedoaneurysm was a deviation from the standard of care required of general surgeons at Chabert. According to Dr. Shamblin, the surgeons should have performed a Hartman's pouch procedure and colostomy, which would have directed the open end of the intestines out of Mrs. Thibodaux's body through the abdominal wall and closed off the remaining portion of her intestines, eliminating any suture line near the pseudoaneurysm. Alternatively, the surgeons should have placed omentum, a fatty tissue buffer, between the pseusoaneurysm and the suture line of the anastomosis so as to prevent erosion and formation of a fistula.
*691 Dr. Thomas Boos, a board-certified general surgeon and member of the medical review panel that found no deviation from any applicable standard of care by Chabert or the individual surgeons, testified on behalf of Chabert. Dr. Boos stated that he had never heard of a contraindication of performing a primary end-to-end anastomosis in the presence of a pseudoaneurysm and that he has performed this exact surgery on several occasions. In his opinion, either a Hartman's pouch and colostomy or an end-to-end anastomosis was acceptable at that time, and the surgeons did not deviate from any applicable standard of care by choosing to perform the end-to-end anastomosis.
Further, Dr. Boos stated he did not fee that placement of omentum would have made any difference and has never heard of having to use omentum for a pseudoaneurysm. However, Dr. Boos did acknowledge that omentum is recommended in aneurysm repairs to buffer the anastomosis of the graft to prevent constant rubbing of the suture line from pulsation of the arteries against the duodenum, which will infect the anastomosis, break down the suture line, and, over time, cause a duodenal fistula. Dr. Boos acknowledged that all aneurysms pulsate the same and that the pseudoaneurysm in this case pulsated all around, including against the anastomosis. However, Dr. Boos was of the opinion that there was no need to place omentum between the pseudoaneurysm and the suture line in the absence of a graft.
Clearly, the testimony of the experts conflicts, and the trial court's decision to credit the testimony of one expert over the other demands great deference. Lefort, 95-1472 at p. 4, 676 So.2d at 221. Chabert asserts, however, that the development of an aortacolonic fistula is extremely rare, that there was no established standard of care for preventing such an occurrence, and that Dr. Shamblin's opinion regarding the standard of care was not supported by medical evidence. Particulary, Chabert asserts, in addition to Dr. Shamblin's inexperience with pseudoaneurysms or aortacolonic fistulas and inexperience in performing an end-to-end anastomosis, the 1981 medical journal article upon which Dr. Shamblin relies deals with the prevention of aortaduodenal fistulas and not aortacolonic fistulas as occurred in the instant case.
However, Dr. Shamblin stated that he studied with Dr. Marden Black, who specialized in colon surgery and thyroid surgery, during his residency at the Mayo Clinic. Dr. Shamblin also stated that he researched pseudoaneurysms and aortaenteric fistulas and stated that the principle of preventing a fistula would be the same for a duodenal fistula and an enteric fistula. Dr. Shamblin stated that an aortaenteric fistula is between the aorta and the intestine whereas an aortaduodenal fistula is between the aorta and the duodenum. In preventing duodenal fistulas, material is placed between the aneurysm or graft and the duodenum so the fistula is less likely to occur. Dr. Shamblin stated that the principle is the same for an aortaenteric fistula, but the material covers the colon rather than the duodenum.
After a thorough review of the entire record, we find no error in the trial court's decision to accept the testimony of Dr. Shamblin as more credible than the expert testimony offered by Chabert. While all the testimony indicates that the formation of this particular kind of fistula is very rare, the medical evidence and testimony also indicates that fistulas in general are known to develop under certain circumstances, namely from a pulsating aneurysm or pseudoaneurysm compressed against a suture line, and omentum serves as a buffer to keep this pulsating mass from causing a fistula. Dr. Patronella *692 even acknowledged in his deposition testimony that as a fifth-year general surgery resident, he knew that a pulsating pseudoaneurysm, which is compressing the intestines and surrounding structures, could erode and cause a fistulas tract. Therefore, because these factors were present in the instant case and the surgeons were admittedly aware of them, we find no error in the trial court's finding that the surgeons at Chabert breached the applicable standard of care in failing to place omentum between the pseudoaneurysm and the suture line from the anastomosis.

CONCLUSION
For the foregoing reasons, we affirm the trial court's judgment finding in favor of Mr. Thibodaux. All costs of this appeal in the amount of $5,982.51 are to be borne by the appellant, Chabert Medical Center.
AFFIRMED.
NOTES
[1] At the time of Mrs. Thibodaux's admission, Chabert was known as South Louisiana Medical Center.
[2] Dr. Thomas Downes and Dr. Jose Mena assisted during the surgery.
[3] There is no dispute that the pseudoaneurysm was the result of an aortobifemoral graft placement that had been performed at Terrebonne General Hospital several years prior to the April 1988 surgery.
[4] Chabert does not assign error to the trial court's finding of causation. Accordingly, our discussion is limited to determining whether the trial court erred in finding that Mr. Thibodaux established the applicable standard of care of general surgeons and that the surgeons in the instant case breached that standard of care.