657 So.2d 1066 (1995)
Billy Wayne DIEZ and Sheila G. Diez
v.
SCHWEGMANN GIANT SUPERMARKETS, INC.
No. 94 CA 1089.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*1067 Eddie J. Lambert, Gonzales, for plaintiffs-appellees Billy Wayne Diez and Sheila G. Diez.
Michael W. McKay and Ann M. Halphen, Baton Rouge, for defendant-appellant Schwegmann Giant Supermarkets, Inc.
Before WATKINS and FOGG, JJ., and TANNER, J. Pro Tem.[1]
WATKINS, Judge.
The plaintiff, Mr. Billy Wayne Diez, filed suit against Schwegmann Giant Supermarkets, Inc. (Schwegmann), alleging that he was injured when he slipped on liquid soap and fell in defendant's store in Baton Rouge, Louisiana, on January 14, 1991. The plaintiff's wife, Mrs. Sheila G. Diez, joined in his suit seeking damages for loss of consortium. *1068 A trial by jury resulted in an inconsistent verdict from which the defendant sought judgment in its favor by way of a post trial rule to show cause. After a hearing on the rule the trial court rendered judgment in accordance with the general verdict, attributing 88% fault to Schwegmann and 12% to Mr. Diez.
Schwegmann appealed alleging the trial court erred in signing a judgment in favor of the plaintiffs based upon the jury verdict and further alleging error by the jury in finding that defendant created or had actual or constructive notice of the condition which caused plaintiff's fall prior to the occurrence. Plaintiffs answered the appeal seeking additional damages and reversal of that portion of the judgment assessing Mr. Diez with 12% fault.
We will first address the threshold issue of whether the jury verdict was inconsistent, and then, the propriety of the judgment entered by the trial court. The jury completed the jury verdict form as follows:
1. DID BILLY WAYNE DIEZ PROVE, BY A PREPONDERANCE OF THE EVIDENCE,
THAT A CONDITION EXISTED AT SCHWEGMANN GIANT SUPERMARKETS, INC.,
WHICH PRESENTED AN UNREASONABLE RISK OF HARM TO BILLY WAYNE DIEZ
AND THAT THAT RISK OF HARM WAS REASONABLY FORESEEABLE?
 YES YES NO ________
IF THE ANSWER TO NO. 1 IS "NO," PLEASE DATE AND SIGN THIS FORM AND
RETURN IT TO THE COURTROOM.
2. DID SCHWEGMANN GIANT SUPERMARKETS, INC. CREATE OR HAVE ACTUAL OR
CONSTRUCTIVE NOTICE OF THE CONDITION, PRIOR TO THE OCCURRENCE?
 YES YES NO ________
IF YOUR ANSWER TO NO. 2 IS "NO," PLEASE DATE AND SIGN THIS FORM AND
RETURN IT TO THE COURTROOM.
3. DID SCHWEGMANN GIANT SUPERMARKETS, INC. FAIL TO EXERCISE REASONABLE
CARE IN CREATING OR NOTICING AND CORRECTING THIS CONDITION?
 YES ________ NO NO 
4. DID BILLY WAYNE DIEZ FALL BECAUSE OF HIS NEGLIGENCE IN FAILING TO
SEE AN OBVIOUS CONDITION?
 YES ________ NO NO 
5. WHAT PERCENTAGE OF THE NEGLIGENCE OR FAULT, IF ANY, DO YOU ASSESS
AGAINST EACH OF THE PARTIES: (YOUR TOTAL MUST EQUAL 100%)
 A) SCHWEGMANN'S....................___ 88___%
 B) BILLY WAYNE DIEZ................___ 12___%
 TOTAL...........................___100___%
6. IN TERMS OF DOLLARS, HOW MUCH IN DAMAGES DID BILLY WAYNE DIEZ
SUSTAIN AS A RESULT OF THE ACCIDENT? YOU MAY OR MAY NOT FIND DAMAGES
IN ONE OR MORE OF THE FOLLOWING CATEGORIES, BUT EACH BLANK MUST BE
FILLED IN, EITHER IN A DOLLAR AMOUNT OR WITH A ZERO (0) IF YOU FIND NO
DAMAGES FOR ANY PARTICULAR CATEGORY. DO NOT CONSIDER THE PERCENTAGES
IN NUMBER 5 WHEN YOU LIST THE DAMAGES. THE COURT WILL DO SO, IF
APPLICABLE.
ANSWER IN DOLLARS:
$ 3,500.00 PAST MEDICAL EXPENSES;
$ 20,000.00 FUTURE MEDICAL EXPENSES
$50,000.00 PHYSICAL INJURY, DISFIGUREMENT OR DISABILITY
*1069
$60,000.00 PHYSICAL PAIN AND SUFFERING, PAST AND FUTURE;
$70,000.00 MENTAL ANGUISH AND DISTRESS, PAST AND FUTURE.
7. IF THE PLAINTIFF'S WIFE, SHEILA G. DIEZ, PROVED INJURY, WHAT IS THE
AMOUNT OF HER DAMAGES FOR LOSS OF CONSORTIUM? $ 2000.00 
PLEASE HAVE FOREPERSON DATE AND SIGN BELOW.
DATE: Nov. 23, 1993
 /s/ Richard Hagen
 FOREPERSON
The answers to interrogatories No. 3 and No. 4 are clearly in conflict with the general verdict, No. 5, bringing the verdict squarely within the provisions of LSA-C.C.P. art. 1813, which states in pertinent part:
C. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.
D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.
In House v. Thompson, 452 So.2d 1195 (La.App. 1st Cir.) writ denied, 457 So.2d 15 (La.1984) this court held that when a trial court directs a jury to make answers to interrogatories and to render a general verdict, and the answers and verdict are inconsistent, the trial court has three options: to direct entry of judgment in accordance with the answers, notwithstanding the general verdict; to order a new trial; or to return the jury for further consideration of its answers and its verdict. The choice of which option to exercise is a matter within the sound discretion of the court. Id. Thus, under the provisions of LSA-C.C.P. art. 1813 and the interpretive jurisprudence, the trial court has the authority to render judgment in accordance with the specific interrogatories, but lacks the authority to render judgment in accordance with the general verdict when the two are in conflict.
Contrary to the statute and the jurisprudence, the trial court entered judgment in accordance with the general verdict of the jury, assessing 88% fault to Schwegmann and 12% fault to Mr. Diez, notwithstanding the answer to interrogatory No. 4 indicating no fault on the part of Mr. Diez and interrogatory No. 3 indicating that Schwegmann did not fail to use reasonable care. Because these answers are in conflict with the general verdict, the trial court should have either directed the entry of judgment in accordance with the answers, returned the jury for further consideration of its answers and verdict, or ordered a new trial. Hence, the trial court's entry of judgment on the general verdict was reversible error, and we vacate the judgment. See Daigle v. White, 544 So.2d 1260 (La.App. 4th Cir.1989).
Our review now turns to the jury's answer to the interrogatories, which review is governed by the manifest error standard, unless the jury interrogatories were so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3d Cir.1991); Lewis v. *1070 Wal-Mart Stores, Inc., 546 So.2d 267 (La. App. 3d Cir.1989). If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. Id.
In making the determination of the adequacy of the jury instructions and interrogatories, we turn to the pertinent law with regard to suits against merchants for injuries sustained from falls on their premises. As amended in 1990, LSA-R.S. 9:2800.6, details the proof requirements in claims against merchants as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
(C) Definitions:
(1) "Constructive notice" means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
(D) Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322 or 2695.
Although the interrogatories propounded to the jury in the instant case appear to be in conformity with the statute, we believe the way the questions were posed created a confusing and misleading verdict form. The form does not provide a mechanism for the jury to indicate whether its decision was that the merchant created the hazard, or had actual knowledge of the hazard, or had constructive knowledge of the hazard. If the jury determined the merchant created the hazard referenced in interrogatory No. 1, then a negative answer to interrogatory No. 3 would be in conflict with its affirmative answers to interrogatories No. 1 and No. 2. The same situation exists if the jury determined that the merchant had constructive notice. The definition of "constructive notice" is "the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care." If the jury determined there was constructive notice, an affirmative answer to interrogatory No. 3 is the only possible answer, by definition. However, if the merchant had actual notice of the hazard, the conclusion that the merchant did not exercise reasonable care was not mandated and a negative answer to interrogatory No. 3 would not conflict with affirmative answers to interrogatories No. 1 and No. 2. In the instant case there is no evidence of actual notice, thus, the jury's answer to interrogatory No. 3 conflicts with its answers to interrogatories No. 1 and No. 2. Because of the conflict, we cannot determine the jury's intent. We further believe that the failure to instruct the jury to cease deliberations after a negative answer to interrogatory number three confused the jury and precluded it from reaching a verdict based on the law and the facts. Accordingly, we are compelled to interdict the entire jury verdict.
As an appellate court we now have the option of remanding the case for a new *1071 trial or deciding the case on the record. In order to exercise the option correctly, we must look at the record before us. When a preponderance of the evidence cannot be determined fairly from the cold record, such as when there is a substantial conflict in the testimony that cannot be determined without deciding on the credibility of the witnesses, remand is proper. See Tabor v. Doctor's Memorial Hospital, 501 So.2d 243 (La.App. 1st Cir.1986).
The record reveals that Mr. and Mrs. Diez stopped at Schwegmann to pick up a few things. After entering the store, Mr. Diez left his wife on the pantyhose aisle while he went to find catsup. He stated that he searched on several aisles for the catsup and could not find it. He testified that at this point he had spent approximately five or six minutes looking for the catsup and was frustrated because he could not find it. He decided to find his wife and proceeded back to where he had left her. When he returned to the aisle where his wife was, he testified that he was sort of agitated and in a hurry, and he was no longer looking for the catsup; he was looking at his wife when he slipped on a liquid soap substance on the floor. After the fall, he was unable to move and was taken to a hospital by ambulance.
Mrs. Diez testified that she and Mr. Diez arrived at Schwegmann at approximately 1:30 p.m., and that they selected flowers from the flower department and then proceeded directly to the pantyhose aisle. She was on the pantyhose aisle for approximately six to seven minutes when her husband returned to find her, and he fell. She believed that the accident occurred at approximately 1:45 p.m.
Rhonda Rhea, an employee of Schwegmann, testified that she was employed as a porterette and that she was responsible for cleaning half of the store, which included the restrooms, floors in the cafeteria and restaurant, grocery aisles, and checkout lanes. She stated that it takes her approximately 30 minutes to clean her side of the store. Contrary to the timing testified to by Mrs. Diez, Ms. Rhea remembered checking aisle 12A and 12B, the aisle where Mr. Diez fell, at 2:00 p.m., which she determined to be approximately 10 minutes before the fall. The accident report compiled by the store security officer, Mr. Crump, indicated that Ms. Rhea checked the aisle 10 minutes before the accident. Ms. Rhea acknowledged that aisle 12B, the detergent aisle, was a high risk aisle because of the merchandise located on that aisle. However, she testified that when she checked the aisle, shortly before the accident, it was clear. She also remembered cleaning aisle 12B at least two other times since her arrival at work at 7:30 a.m. because she recalled cleaning two powdered detergent spills. She explained that two porterettes are always on duty at the store and that they alternated lunch and break schedules to assure that one is always available to inspect and clean. After the accident Ms. Rhea was called and asked to clean the spill. She testified that it took several moppings to clean the spill because it was so slippery. Ms. Rhea admitted on cross examination that she was in fear of losing her job when this accident occurred.
Mr. Gary Veade, the Schwegmann store director, testified that the store was approximately 60,000 square feet and that the flooring on aisle 12B is beige terrazzo. Mr. Veade explained that the only duty of the porterettes is to patrol the floors and remove objects or products on the floor. All other employees, including himself, are charged with the duty of inspecting for spills when they are travelling through the store in connection with their other duties. When Mr. Veade arrived at the accident scene, he saw what appeared to be light blue liquid on the floor; he admitted that it would have been hard to see unless you were looking for it. He remembered that the EMTs arrived approximately 15 minutes after the accident occurred.
Mr. Joseph W. Warnke, Jr., Schwegmann's director of loss prevention, testified that all Schwegmann employees are responsible for detecting hazards. He particularly noted that the sales supervisors, porterettes, security personnel, and store managers are charged with the duty of making visual inspections of the store for hazards. He also stated that employees carry paper towels with them; if they spot something, they are required to either clean it or get someone *1072 else to clean it up. He also explained that Schwegmann no longer requires its porterettes to keep logs of their jobs because logging it required to much time for the porterettes to fill out the forms.
Further testimony concerning timing was given by Mr. Guy Fruge, the emergency medical technician. He assisted Mr. Diez after the fall and testified he received a call from his dispatcher at 2:07 p.m. and arrived at Schwegmann at 2:14 p.m.
Mr. James Crump, the head of security for Schwegmann, was paged at 2:10 p.m. concerning the accident. When he arrived at the scene, he noticed and felt a blue soapy liquid on the floor; he stated the liquid was not hard for him to see. He could not determine where it came from because he could not find any other drips or loose caps on the shelves. He stated that he checked several aisles in the store, looking for drips coming from shopping carts but could not find any. He could not remember when he last walked down aisle 12B prior to the accident.
Because Schwegmann kept no logs of its inspections and cleaning procedures, the testimony of its employees and others involved in assisting after the fall occurred is the only available proof. Consequently, credibility determinations are crucial, and are particularly within the province of a trial judge or jury; we will not attempt to make credibility determinations on the cold record and thus deprive plaintiffs of their right to present their case before a trier of fact. As the record presents substantial conflicts in the testimony and serious questions of credibility, we are convinced that the interests of justice would be served best by remanding for a new trial.
For the reasons expressed, we vacate the judgment of the trial court and remand this case for a new trial consistent with this opinion.
JUDGMENT VACATED AND REMANDED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.