858 So.2d 454 (2003)
Michael LANDRY, Sr., Michael J. Landry, Jr. Chris M. Landry, Jeff A. Landry and Jason P. Landry
v.
LEONARD J. CHABERT MEDICAL CENTER, Dr. Ronald Marts, Dr. John C. King, Dr. Jonah Ezieme, Dr. Joe Johnson, and Dr. Thomas Ferguson.
No. 2002 CA 1559.
Court of Appeal of Louisiana, First Circuit.
May 14, 2003.
Writ Denied October 17, 2003.
*458 Jerald P. Block, Matthew F. Block, Thibodaux, for Plaintiffs/Appellees, Michael Landry, Sr., et al.
G. Scott Vezina, Kelli M. Khalaf, Gretna, for Defendants/Appellants, Leonard J. Chabert Medical Center, et al.
Before: CARTER, C.J., WHIPPLE, and CIACCIO,[1] JJ.
CARTER, C.J.
This is an appeal of a judgment rendered in accordance with a jury verdict awarding damages based on medical malpractice, as well as a subsequent judgment awarding costs under LSA-C.C.P. art. 970.

*459 FACTS
Linda Landry went to the emergency room at the Leonard J. Chabert Medical Center (Chabert) on February 16, 1998 complaining of the worst, most intense headache of her life. A check of her vital signs revealed that her blood pressure was elevated. A physician's assistant performed a physical exam, then ordered and performed a lumbar puncture, which ruled out a subarachnoid hemorrhage. A CT scan was performed early the next morning, which a resident read as negative for acute changes. After the resident diagnosed her with a muscle tension headache, Ms. Landry was discharged early on February 17, 1998, with instructions to take medication for pain, to follow up in the clinic in two to four weeks and to return to the emergency room if her headache worsened, she experienced blurry vision, nausea or vomiting.
On February 18, 1998, Ms. Landry called Chabert's internal medicine clinic and indicated that she experienced vomiting the day before and still had a headache. A nurse informed Ms. Landry that Dr. Ronald Marts advised that she come to the clinic as soon as possible. In the clinic, Dr. Marts performed a neurological examination, which established that Ms. Landry could not see in the left visual field. Dr. Marts also reviewed the radiologist's report of the CT scan performed in the emergency room. The radiologist did not read the CT scan as negative, but concluded that the findings of the CT scan were suggestive of two or three small infarcts (regions of the brain where the blood supply has been cut off). Dr. Marts then ordered a second CT scan to determine if there were any serial changes. The radiologist's report of the second CT scan indicated a "massive cerebral infarct." Dr. Marts' primary diagnosis was a right subcortical cerebrovascular accident (stroke). Dr. Marts ordered a neurology consult, administered medication and admitted Ms. Landry to Chabert's hospital.
Chabert is a teaching hospital. While a patient at Chabert, Ms. Landry was seen daily by nurses, and by Dr. Jonah Ezieme, a first-year intern. At various times she was also seen by other doctors on staff at Chabert. However, Ms. Landry's stroke progressed and her condition deteriorated. On February 23, 1998, Ms. Landry was moved to the intensive care unit. Ms. Landry died on February 26, 1998.
Ms. Landry's husband and four sons (plaintiffs) first presented their medical malpractice complaint to a medical review panel, then filed suit for damages.[2] After trial, the jury found that Chabert as well as Drs. Thomas G. Ferguson and Joe E. Johnson, Jr., breached the standard of care, and that the breach by Drs. Ferguson and Johnson caused Ms. Landry's chance of survival to decrease. The jury awarded damages for Ms. Landry's pain and suffering, past and future lost wages, and funeral and burial expenses, as well as for her husband's and four sons' pain and anguish and loss of love and affection. Judgment was rendered against Chabert and Drs. Ferguson and Johnson, in accordance with the jury's verdict, with the amount of damages reduced in accordance with the cap limitations in medical malpractice cases.[3] Subsequently, the trial *460 court awarded plaintiffs costs under LSA-C.C.P. art. 970, totaling $61,910.19. Chabert, Dr. Johnson and Dr. Ferguson (Defendants), now appeal.

MOTION TO CONTINUE
Approximately five days prior to trial, defendants filed a motion to continue the trial contending they had recently discovered that Ms. Landry was treated at Lakewood Hospital and that this information was not disclosed during discovery. The next day, defendants amended their motion to continue contending they had also discovered that Ms. Landry was treated at Thibodaux Regional Medical Center. Defendants asked for a continuance to enable them to conduct further discovery regarding the newly discovered information. Both the original and amended motions to continue were denied. On appeal, defendants complain that they were prejudiced by the denial of a continuance.
Louisiana Civil Code articles 1601 et seq. provide for continuances in civil proceedings. Under LSA-C.C.P. art. 1602, a continuance is mandatory if the movant shows: 1) that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or 2) a material witness has absented himself without the contrivance of the party applying for the continuance. In addition to the peremptory grounds set forth in LSA-C.C.P. art. 1602, the trial court has discretion to grant a continuance where there is good ground therefor. LSA-C.C.P. art. 1601.
Defendants argue the new evidence would establish a history of hypertension and possibly Landry's non-compliance with prescribed treatments. They also contend the evidence could have proven that the infarcts shown on the CT scan in the emergency room were old and unrelated to the stroke shown on the later CT scan. However, the record establishes that Landry did have a history of hypertension and that she was not taking any medication for hypertension in February of 1998. Moreover, there was abundant testimony that the infarcts shown on the CT scan taken in the emergency room were old. Thus, we find that defendants did not prove the existence of either of the peremptory grounds for a continuance under LSA-C.C.P. art. 1602.
The trial court has great discretion in granting or denying a continuance under LSA-C.C.P. art. 1601. The trial court's ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. Sauce v. Bussell, 298 So.2d 832, 834 (La.1974). After reviewing the record in the instant matter, we find no such abuse of discretion. This assignment of error is without merit.

PEREMPTORY EXCEPTION RAISING THE OBJECTION OF NO CAUSE OF ACTION
Prior to trial, five individual physicians who were named as defendants in this matter filed a peremptory exception raising the objection of no cause of action contending the Malpractice Liability for State Services Act (MLSSA) does not recognize a cause of action against health-care providers in their individual capacities. On February 20, 2001, the trial court entered judgment denying the peremptory exception. After trial, two of the individual physicians, Drs. Ferguson and Johnson, were cast in judgment. On appeal, defendants *461 contend the trial court erred in denying the exception.[4]
The objection of no cause of action is properly raised by the peremptory exception and questions whether the law extends a remedy to anyone under the factual allegations of the petition. The purpose of an exception pleading the objection of no cause of action is to determine the sufficiency in law of the petition. Richardson v. Home Depot USA, XXXX-XXXX, p. 3 (La.App. 1st Cir.3/28/01), 808 So.2d 544, 546.
Generally, no evidence may be introduced to support or controvert the exception. However, there is a jurisprudentially recognized exception to this rule, which allows the court to consider evidence that is admitted without objection to enlarge the pleadings. The exception is triable on the face of the pleadings, and, for purposes of determining the issues raised by the exception, the well pleaded facts in the petition must be accepted as true. The court must determine if the law affords plaintiff a remedy under those facts. Richardson, 808 So.2d at 546-547.
The Fourth Circuit Court of Appeal has analyzed this issue and concluded that nothing in the MLSSA prohibits covered individual physicians from being named as defendants in medical malpractice cases. Carey v. Rao, XXXX-XXXX, p. 12 (La.App. 4th Cir.9/11/02), 828 So.2d 53, 62, writ denied, 2002-2524 (La.12/13/02), 831 So.2d 986. We agree. We find no error in the trial court's denial of defendants' peremptory exception raising the objection of no cause of action. Accordingly, we affirm the interlocutory judgment of the trial court rendered February 20, 2001.

LIABILITY FOR MEDICAL MALPRACTICE

STANDARD OF REVIEW
With regard to the jury's finding of liability, defendants contend that the jury's verdict was inconsistent and that the trial court should not have entered judgment thereon, citing LSA-C.C.P. art. 1813 E.[5] Defendants urge this court to either remand this matter for new trial or undertake de novo review of the record. See Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089 (La.App. 1st Cir.6/23/95), 657 So.2d 1066, writ denied, 95-1883 (La.11/17/95), 663 So.2d 720.
On the jury verdict form, in response to the first interrogatory, the jury indicated that it found that Drs. Ferguson and Johnson, as well as Bradley Chauvin (the physician's assistant who saw Ms. Landry in the emergency room), failed to exercise the degree of care, skill and judgment that is usually exercised by reputable physicians of the same school of medicine or in the same or similar circumstances. The jury answered "Yes" to the second interrogatory, which asked, "Did Chabert Medical Center fail to exercise the degree of care toward Mrs. Landry that her condition *462 required?" The verdict form then instructed the jury that if it answered yes to any part of interrogatories one or two, then it should proceed to question three, which asked, "If you found that any of the above defendants breached the duty owed to Mrs. Landry, did that breach cause Linda Landry's chance of survival to decrease?" The jury answered "Yes" as to Drs. Johnson and Ferguson, "No" as to Bradley Chauvin, P.A., and did not respond either affirmatively or negatively as to Chabert.
Defendants allege two inconsistencies in the verdict form, the first of which is that the jury found that Chabert failed to exercise the degree of care owed to Ms. Landry but failed to indicate whether that failure caused Ms. Landry's chance of survival to decrease. However, under the doctrine of respondeat superior, a hospital is responsible for the negligence of its employees. Estate of Wilburn v. Leggio, 36,534, p. 5 (La.App. 2nd Cir.3/19/03), 842 So.2d 1175, 1178. The trial court charged the jury with this principle of law. The jury did find that two of the hospital's employees, Drs. Ferguson and Johnson, breached the standard of care and that their breach caused Ms. Landry's chance of survival to decrease. Thus, although the jury did not answer interrogatory three as to Chabert, because of the application of the doctrine of respondeat superior, we find no error in the trial court's entry of judgment reflecting a finding of liability on the part of Chabert.
The second inconsistency alleged by defendants is that the jury found Drs. Ferguson and Johnson liable, but did not find the intern, Dr. Ezieme, liable. Defendants argue that the jury's verdict against Drs. Ferguson and Johnson is based solely on their administrative and/or supervisory roles, but, under LSA-C.C. art. 2320,[6] there can be no liability on the part of these principals without a finding of liability on the part of their agent. However, Drs. Ferguson and Johnson were sued individually, without the limitation that their liability was based solely on actions of their agent. Moreover, the jury was not instructed that it could find Drs. Ferguson and Johnson liable only as principals, with liability conditional on liability by their agent. We find that the jury could have concluded that Drs. Ferguson and Johnson themselves breached the applicable standard of care, and that their breach decreased Ms. Landry's chance of survival. Thus, we find no inconsistency in the verdict as to liability on the part of Drs. Ferguson and Johnson.
Considering the foregoing, we find no error in the trial court's entry of judgment based on the jury verdict. There is no basis for a remand for new trial or for this court to conduct de novo review of the record. Thus, we will apply the manifest error standard of review, which is applicable in medical malpractice cases. See Etcher v. Neumann, 2000-2282, p. 8 (La.App. 1st Cir.12/28/01), 806 *463 So.2d 826, 835, writ denied, XXXX-XXXX (La.5/31/02), 817 So.2d 105.
Under the manifest-error standard of review, a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). When there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Touchard v. Slemco Elec. Foundation, 99-3577, p. 5 (La.10/17/00), 769 So.2d 1200, 1204. Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable under the evidence presented. When a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Touchard., 769 So.2d at 1204.

BURDEN OF PROOF
The MLSSA defines medical malpractice as:
any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
LSA-R.S. 40:1299.41 A(8). In suits alleging medical malpractice by a physician, the plaintiff bears the burden of proving by a preponderance of the evidence that the physician's treatment fell below the ordinary standard of care in his specialty, as well as a causal relationship between the alleged negligent treatment and the resulting injury. LSA-R.S. 9:2794; Richardson v. O'Byrne, 2000-2202, p. 10 (La.App. 4th Cir.10/16/02), 830 So.2d 1013, 1021, writ denied, 2002-2771 (La.1/24/03), 836 So.2d 49.

LIABILITY OF DR. JOHNSON
It is undisputed that Dr. Johnson was the attending physician on duty on February 19, 1998, the day after Ms. Landry was admitted to Chabert on an in-patient basis. Medical records for that date show that Dr. Ezieme, the first-year intern, signed the physician's notes and Dr. Kamo, a resident, signed the physician's order form. The only notation by Dr. Johnson on Ms. Landry's medical records for February 19 indicates that he would be on vacation from February 20 through 24 and that Dr. John C. King and Dr. Marts were to cover.
Dr. John Stirling Meyer, who testified as an expert in the field of neurology, explained that he has trained residents, interns and medical students. Dr. Meyer testified that it is a requirement of teaching hospitals that the attending staff supervise the interns and residents. In fact, Chabert's bylaws state that medical staff shall not delegate the responsibility of diagnosis and care of patients to practitioners not qualified to undertake that responsibility and who are not adequately supervised. Dr. King, a general internist on staff at Chabert, who testified as an expert in the field of internal medicine, explained that, ultimately, the treatment *464 of patients is the attending physician's responsibility.
Dr. Johnson testified that if Ms. Landry were admitted to the hospital on February 18, he would have discussed her case with Dr. Ezieme and other doctors on February 19 at what is called "morning report." Dr. Ezieme remembered presenting the case plan to the panel of physicians at morning report. Typically, after morning report, the intern would then see patients with the attending physician. However, the medical records do not indicate whether this was done on February 19.
Dr. Johnson testified that he did see Ms. Landry on February 19. However, Dr. Rose Kumar, who testified as an expert in the field of internal medicine, did not see any indication that Dr. Johnson actually supervised Dr. Ezieme. Considering this, Dr. Kumar testified that in her expert opinion, Dr. Johnson breached the applicable standard of care.
Considering all of the evidence presented, it is clear that the jury accepted the opinion of Dr. Kumar over that of the other witnesses. Based on this credibility determination, we cannot say the jury was manifestly erroneous in its finding that Dr. Johnson failed to meet the applicable standard of care.

LIABILITY OF DR. FERGUSON
Dr. Ferguson served as Chabert's medical director at the time of Ms. Landry's hospitalization. Dr. Ferguson did not personally treat Ms. Landry but was responsible for scheduling the physicians charged with providing her medical treatment.
Dr. Ferguson testified that Dr. David Paul Sampagnoro was the attending internal medicine doctor on duty on February 20, 21 and 22. Dr. Sampagnoro's name does not appear in any of Ms. Landry's medical records. However, Dr. Sampagnoro testified that he came on duty on February 20 after evening rounds and oversaw Dr. Ezieme the weekend of February 21 and 22. Dr. Sampagnoro admitted that he did not see Ms. Landry on February 20 and agreed there is no record of any attending physician overseeing Dr. Ezieme on February 20.
Review of Ms. Landry's medical records reveals no supervisory physicians' notes during the first four days of her hospital stay, other than the notation made by Dr. Johnson on February 19 regarding his vacation. Dr. Kumar testified that her review of the nursing notes indicates Ms. Landry was deteriorating during that time period. In Dr. Kumar's opinion, there was basically nothing done. Dr. Meyer agreed, testifying, "I'm sorry to tell you that this poor woman was really abandoned." In Dr. Kumar's expert opinion, Dr. Ferguson breached the applicable standard of care in failing to schedule physician coverage or ensure that Chabert's bylaws regarding supervision were followed.
The jury heard Dr. Ferguson's testimony that attending physicians are not required to co-sign interns' notes. The jury also heard the testimony of various physicians on staff at Chabert that in their opinion Dr. Ezieme was not acting alone in treating Ms. Landry, notwithstanding the lack of such documentation in Ms. Landry's medical records. Despite this, the jury accepted the medical evidence supporting a conclusion that Dr. Ferguson breached the applicable standard of care. As this was a credibility determination, we cannot say the jury's finding, which is reasonably supported by the evidence, was manifestly erroneous.

CAUSATION
Defendants argue that plaintiffs failed to prove by a preponderance of the *465 evidence that Ms. Landry had a greater than 50% chance of survival. Therefore, defendants argue, plaintiffs did not meet their burden of proof for either a survival or wrongful death action.
Defendants' argument is based on testimony by Dr. Kumar indicating that if the National Institute of Health stated that 80% of individuals with malignant cerebral artery syndrome, then she would agree the statement is true. Thus, defendants argue, plaintiffs could not prove that Ms. Landry had a greater than 50% chance of survival. However, defendants do not cite any testimony or medical record that conclusively shows that Ms. Landry was diagnosed with malignant cerebral artery syndrome. Rather, the medical records show and the general consensus of the witnesses was that Ms. Landry suffered a stroke.
Several expert witnesses, including Drs. Kumar, Ferguson and Charlet, stated that if the National Institute of Health stated that 30% of stroke patients die, they would agree the statement is true. Necessarily, this means 70% of stroke patients survive. Moreover, Dr. Meyer indicated that the 30% figure includes both patients suffering ischemic strokes (such as Ms. Landry's) and those suffering hemorrhagic strokes, which have a worse prognosis.
Dr. Meyer testified that with appropriate treatment, including administration of a pharmaceutically produced enzyme and surgery, Ms. Landry would probably be alive today and would, at worst, suffer from some loss of vision in her left eye. Dr. Meyer opined that there was a way for an appropriately trained physician who was paying attention to stop the progression of Ms. Landry's stroke.
Dr. Ferguson disagreed that Ms. Landry was a candidate for the treatments Dr. Meyer advocated. In fact, Dr. Ferguson testified that there was no treatment available for Ms. Landry's condition. Dr. King agreed. However, Dr. Marts testified that although there is no proven treatment for completely arresting the swelling associated with a stroke, he did not believe that Ms. Landry was "past the point of no return" when he examined her on February 18.
The jury chose to believe the testimony of Dr. Meyer, an expert in the field of neurology, over the conflicting testimony of the doctors who were experts in the field of internal medicine. Considering this credibility determination, we cannot say the jury's finding regarding causation was manifestly erroneous.

DAMAGES
The discretion vested in the trier of fact is "great," even vast, so an appellate court should rarely disturb an award of general damages. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point, reasonably within that discretion. Youn, 623 So.2d at 1260.
*466 Defendants' assignment of error is couched in terms of plaintiffs' damages for mental pain and suffering and loss of love and affection being excessive. However, they argue only that the jury erred in awarding wrongful death and survival damages when damages should have been limited to Ms. Landry's loss of chance of survival. We have already determined that plaintiffs met their burden of proof on the issue of causation and that their available damages were not limited to loss of chance of survival.
Although not argued, we have reviewed the record and particularly the testimony of Ms. Landry's surviving husband, four sons, daughter-in-law, and sister. Ms. Landry was forty-six when she died and, at that time, three of her sons were living in the family home. All testified to the family's close relationship and the devastating effect of Ms. Landry's death. After thorough review, we find the jury did not abuse its vast discretion in setting the amount of general damages.

COSTS UNDER LSA-C.C.P. ART. 970
The trial court awarded plaintiffs their total costs, in the amount of $61,910.19, under LSA-C.C.P. art. 970, which provides, in pertinent part:
A. At any time more than thirty days before the time specified for the trial of the matter, without any admission of liability, any party may serve upon an adverse party an offer of judgment for the purpose of settling all of the claims between them. The offer of judgment shall be in writing and state that it is made under this Article; specify the total amount of money of the settlement offer; and specify whether that amount is inclusive or exclusive of costs, interest, attorney fees, and any other amount which may be awarded pursuant to statute or rule. Unless accepted, an offer of judgment shall remain confidential between the offeror and offeree. If the adverse party, within ten days after service, serves written notice that the offer is accepted, either party may move for judgment on the offer. The court shall grant such judgment on the motion of either party.
B. An offer of judgment not accepted shall be deemed withdrawn and evidence of an offer of judgment shall not be admissible except in a proceeding to determine costs pursuant to this Article.
C. If the final judgment obtained by the plaintiff-offeree is at least twenty-five percent less than the amount of the offer of judgment made by the defendant-offeror or if the final judgment obtained against the defendant-offeree is at least twenty-five percent greater than the amount of the offer of judgment made by the plaintiff-offeror, the offeree must pay the offeror's costs, exclusive of attorney fees, incurred after the offer was made, as fixed by the court.
D. The fact that an offer is made but not accepted does not preclude a subsequent offer or a counter offer. When the liability of one party to another has been determined by verdict, order, or judgment, but the amount or extent of the damages remains to be determined by future proceedings, either party may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than thirty days before the start of hearings to determine the amount or extent of damages.
E. For purposes of comparing the amount of money offered in the offer of judgment to the final judgment obtained, which judgment shall take into account any additur or remittitur, the final judgment obtained shall not include any amounts attributable to costs, interest, *467 or attorney fees, or to any other amount which may be awarded pursuant to statute or rule, unless such amount was expressly included in the offer.
On appeal, defendants contend the award was erroneous.
The function of article 970 is to compensate the rejected offeror who was forced to incur greater trial litigation costs than he would have if the defendant had accepted his settlement offer. Edwards v. Daugherty, 98-635, p. 10 (La.App. 3rd Cir.6/9/99), 736 So.2d 345, 351, writ denied, 99-2034 (La.9/17/99), 747 So.2d 568. The article is punitive in nature and therefore must be strictly construed. Id. at 351; Chustz v. J.B. Hunt Transport, Inc., 95-0356, p. 2 (La.11/6/95), 662 So.2d 450, 451.
In this case, plaintiffs served on each of the ten named defendants an offer of judgment of $100,000. The offers were rejected. Defendants contend the individual offers should be considered as a single $1,000,000 offer of judgment. Considered as such, the $1,000,000 offer of judgment would exceed the amount of the final judgment and costs under article 970 would be unavailable.
As we have previously determined, nothing in the MLSSA prohibits covered individual physicians from being named as defendants in medical malpractice cases. However, the MLSSA provides a cap on damages in medical malpractice cases. LSA-R.S. 40:1299.39 F provides, in pertinent part:
Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars.
Thus, for any act of malpractice, a plaintiff's recovery, whether by settlement or judgment, is clearly limited to $500,000.
In this case, if each individual defendant had accepted plaintiffs' offers of judgment, then plaintiffs would have recovered a total of $1,000,000. LSA-R.S. 40:1299.39 F prohibits such a settlement. Therefore, we find that plaintiffs' offers of judgment were invalid. Any other interpretation would thwart the purposes of the MLSSA. Considering the invalidity of the offers of judgment, we reverse the portions of the trial court's judgments of November 5, 2001 and December 28, 2001, awarding plaintiffs costs under LSA-C.C.P. art. 970.[7]

CONCLUSION
Considering the foregoing, the trial court's interlocutory judgment of February 20, 2001, which denied the peremptory exception raising the objection of no cause of action, is affirmed. The trial court's judgment of November 5, 2001 is reversed insofar as it awards plaintiffs costs under LSA-C.C.P. art. 970. In all other respects, the trial court's judgment of November 5, 2001 is affirmed. The trial court's judgment of December 28, 2001 is reversed insofar as it grants plaintiffs' motion and awards costs under LSA-C.C.P. art. 970 in the amount of sixty-one thousand nine hundred ten and 19/100 ($61,910.19) dollars together with legal interest.
*468 One-fourth of the costs of this appeal, in the amount of $1,361.25, are assessed to plaintiffs, Michael Landry, Sr., Michael J. Landry, Jr., Chris M. Landry, Jeff A. Landry and Jason P. Landry. Three-fourths of the costs of this appeal, in the amount of $4083.75, are assessed to defendants, Leonard J. Chabert Medical Center, Dr. Thomas Ferguson and Dr. Joe Johnson.
JUDGMENT OF FEBRUARY 20, 2001 AFFIRMED; JUDGMENT OF NOVEMBER 5, 2001 REVERSED IN PART AND AFFIRMED IN PART; JUDGMENT OF DECEMBER 28, 2001 REVERSED IN PART AND AFFIRMED IN PART.
CIACCIO, J., dissents and assigns reasons.
CIACCIO, J., Dissents with Reasons.
I respectfully dissent in part.
I would reverse the judgment insofar as it casts the physicians in judgment and would otherwise affirm.
The Louisiana Supreme Court has interpreted the purpose of Louisiana Revised Statute 40:1299.39 et seq in the decisions they rendered in the cases of Sibley v. Board of Supervisors[1] and Ruiz v. Oniate.[2]
This court has previously recognized that the legislative aim throughout the above-related series of Acts was to "afford or enhance protection for physicians and other persons providing health care to patients on behalf of the state." Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1102 (La.1985) (on rehearing). In fact, we have said the primary objective of the statute is to entice professionals to provide health care to patients on behalf of the state by protecting them against malpractice judgments. Sibley, 477 So.2d at 1103.
Ruiz, 97-2412 at pp. 7-8, 713 So.2d at 446-447.
Louisiana Revised Statute 40:1299.39 C provides as follows:
Since the Louisiana Civil Code was enacted only in the domain of the private law, governs only the legal relationships of private persons among themselves alone, and is inapplicable to public entities and their legal relationships, there is no right nor legal basis ex delicto, or ex quasidelicto, for an action by a patient or his representative to recover damages or any other losses, including those for the death of the patient, from the state or a state health care provider as defined in this Section as a result of malpractice in connection with state-provided or state-related health care; however, a patient, his representative properly acting for him, or his after-death representative shall have a right to recover from the state certain losses to the extent and within the limitations defined and allowed by this Section of public law due to malpractice as defined in this Section, in [the circumstances and within the parameters provided by this Section, on the sole basis of this Section as a special substantive sui generis statutory grant in the domain of public law. This Section shall not be construed to limit, waive, or prohibit claims for lack of informed consent or breach of contract as defined by statutes or otherwise provided by law.
(Footnote omitted)
The language of the act is clear: there is no right nor legal basis ex delicto, for any action by a patient against a state health *469 care provider as a result of malpractice but there is a right of action to recover from the State. In light of the Supreme Court's declaration of the primary objective of the statute, i.e., to protect the health care providers from malpractice judgments, I find that the Malpractice Act insulates the health care providers from being cast in judgment. Accordingly, the exception of no cause of action filed on behalf of the physician defendants should have been maintained.
To allow the physicians to be cast in judgment jointly with the State renders the protection afforded by the act to be meaningless. It is no consolation to declare that they suffer no harm because they will be indemnified by the State. The recordation of the judgment will place a judicial mortgage on all of their real property, thereby preventing a sale of the physicians' real property unless the judgment were paid out of the proceeds. They would be unable to purchase any real property, as the judgment would prevent a lender from financing the purchase. Their salaries could be garnished and their other assets seized.
Since the assets of the State are exempt from seizure, and should the State delay in satisfying the judgment for fiscal or other reasons, there would be nothing to prevent the judgment holder from proceeding to execute his judgment against all of the assets of the physicians that are not exempt from seizure.
The intent of the Act, to protect them from malpractice judgments in order to entice health care providers to work for the state, would be frustrated.
To the extent that the case of Carey v. Rao,[3] holds otherwise I believe that the decision is erroneous and should not be followed by this court.
Accordingly, for the above reasons, I would reverse the judgment insofar as it casts the physicians in judgment.
NOTES
[1] Hon. Philip Ciaccio, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Named as defendants were Chabert, Dr. Ronald Marts, Dr. John C. King, Dr. Jonah Ezieme, Dr. Joe Johnson, Dr. Thomas Ferguson, the State of Louisiana, through the Department of Health and Hospitals, Office of Public Health, Dr. Michael Charlet, Bradley Chauvin, P.A., and South Louisiana Medical Associates.
[3] Under the Medical Liability for State Services Act, which applies to malpractice actions against state health-care providers, a party can recover only $500,000.00 in general damages for medical malpractice claims. LSA-R.S. 40:1299.39 F.
[4] The denial of a peremptory exception raising the objection of no cause of action is interlocutory in nature and generally not appealable. However, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment appealed from. See Carville v. City of Plaquemine, 303 So.2d 289, 290 (La.App. 1st Cir. 1973).
[5] LSA-C.C.P. art. 1813 E provides, "When the [jury's] answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial."
[6] LSA-C.C. art. 2320 provides:

Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.
The master is answerable for the offenses and quasi-offenses committed by his servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.
[7] The judgment of November 5, 2001, which was rendered in accordance with the jury's verdict orders "that all plaintiffs' costs, including expert fees, incurred since August 6, 2001, be taxed as costs pursuant to Louisiana Civil Code Article 970 in a rule to show cause to be fixed [at a later date.]"
[1] 477 So.2d 1094, (La. 1985).
[2] 97-2412 (La.5/19/98), 713 So.2d 442.
[3] XXXX-XXXX (La.App. 4th Cir.9/11/02), 828 So.2d 53.